ELSA BENSON, INC., Plaintiff-Appellant, v. KALMAN FLOOR COMPANY, INC., Defendant-Appellee.

First District (6th Division)   No. 1—88—2177

Opinion filed December 1, 1989.

Epton, Mullin & Druth, Ltd., of Chicago (Robert J. Peters and LeAnn Pedersen Pope, of counsel), for appellant.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Charles B. Lewis, John C. Filosa, and Kathleen F. MacLennan, of counsel), for appellee.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

The plaintiff, Elsa Benson, Inc. (Benson), a general contractor, brought this action against the defendant, Kalman Floor Company, Inc. (Kalman), a subcontractor, to recover damages caused by the defendant's allegedly defective work on a warehouse and manufacturing facility in Chicago, Illinois. The trial judge granted the defendant's motion for summary judgment on the ground that the complaint had not been filed within the statutory limitation period. (Ill. Rev.

Stat. 1985, ch. 110, par. 13—214.) The judge also ruled in favor of the defendant on its motion for judgment on the pleadings, although the judge characterized the motion as one brought under section 2—619 of the Code of Civil Procedure. (Ill. Rev. Stat. 1987, ch. 110, par. 2—619.) The plaintiff contends that the court erred in granting summary judgment because whether the limitation period had expired was a question of fact; that in granting summary judgment the court improperly considered the "facts" as recited in an appellate court opinion and in transcripts from the trial upon which the appellate court opinion was based; and that the court erred in granting judgment on the pleadings.

In 1972, Playskool, Inc. (Playskool), the owner of a warehouse facility located at 4501 West Augusta in Chicago, entered into a contract with Benson whereby Benson agreed to act as general contractor and provide design and construction services with respect to an addition to the existing warehouse.

Benson entered into a contract with Concrete Steel and Timber Erection Company (CST) under which CST agreed to design, furnish and erect all precast concrete components necessary for the construction of the second floor of the warehouse facility. CST, in turn, entered into contracts with two subcontractors to design and fabricate the precast concrete components of the second-floor system, i.e., the columns, ledger beams and double-tee panels. Midwest Concrete Products (Midwest) agreed to design and fabricate the columns and ledger beams, and Blakeslee-Midwest Prestress Concrete Company (Blakeslee) agreed to design and fabricate the double-tee panels. The proposed placement of the columns, the ledger beams and the double-tee panels is shown in a schematic drawing attached to this opinion as Appendix I.

Playskool instructed Benson to enter into a subcontract with Kalman, because Playskool wanted a special Kalman MONOROCK floor installed. Pursuant to Playskool's direction, Benson and Kalman entered into a contract on March 5, 1973, for the installation of a Kalman MONOROCK floor which was to be placed over a precast concrete deck on the second floor. The contract required that the MONOROCK floor be bonded to the precast concrete deck and that welded wire mesh reinforcement be used.

After the facility was completed in December 1973, various problems began to surface. In 1974 cracks began to develop in the second floor over the joints of the double-tee panels; and Kalman was contacted to repair the cracks.

Apparently the cracks were repaired, but the problems did not

end. In February 1976 Playskool informed Benson that a piece of concrete had broken off the ledge of the beam where a double-tee panel was resting, a phenomenon commonly referred to as "spalling."

Meetings were held between Benson, CST, Blakeslee and Midwest in an effort to identify the cause of the spalling. CST hired an independent structural engineer, Erich Mees, to investigate the problem and to assist CST, Blakeslee and Midwest. Mees made a report to CST which set forth his opinion as to the cause of the spalling. CST, Blakeslee and Midwest, in consultation with Mees, developed a repair procedure with the approval of Benson and Playskool.

In January 1977 Playskool notified Benson that more spalling had occurred when a "couple of five-pound pieces of precast concrete came crashing down" inside the employees' entrance on the west side of the building. Benson in turn notified CST that Benson's immediate inspection revealed a repetition of the spalling which had occurred approximately one year before. Benson asked CST to correct the situation. The parties were unable to reach an agreement regarding responsibility for the cost of repairs. As a result, Playskool filed a complaint against Benson in April 1977 alleging fraud, breach of contract and breach of implied warranty of fitness. Benson filed a third-party complaint against CST for contractual indemnity and common law indemnity and against Blakeslee and Midwest for common law indemnity.

After filing its complaint, Playskool retained an engineering firm to develop a repair program for the facility. Ian Chin, a structural engineer, was primarily responsible for developing the repair program. Chin came to certain conclusions and made certain recommendations to Playskool which were followed in the spring of 1979 for the purposes of repair.

However, in the summer of 1981, Chin was contacted by Playskool and told that the problem had recurred. Under Chin's direction, the cracks that had developed after 1979 were repaired during the winter of 1981. During the repair process Chin discovered that there were serious structural defects within the topping slab which he determined had to be removed. During the removal of the topping slab, Chin noticed that the slab was not bonded to the tops of the double-tee panels and that the mesh reinforcement in the topping slab was misplaced. This indicated to Chin that there was no composite action between the topping slab and the double-tee panels. Composite action occurs when the bond between those panels and the topping slab permits the floor system to act structurally as a single unit. It was his opinion that since there was no composite action between the topping

slab and the double-tee panels, the double-tee panels were not capable of supporting the 175-pound design live load requirement of the contract. It was also his opinion that the cracks in the double-tee panels occurred because of the lack of composite action between the topping slab and the double-tee panels. He advised certain persons from Playskool that since there was no composite action between the topping slab and the double-tee panels, the second floor would not meet the design live load requirement and that a thorough analysis of the floor should be conducted. Without composite action, he said, the floor was capable of carrying only 45 pounds per square foot.

The original complaint filed by Playskool in 1977 alleged that "extensive cracking and separation has occurred between the walls and second floor of the manufacturing facility." Playskool later filed an amended complaint in July 1979, which added, "Concrete beams and columns have cracked and failed resulting in a condition of spalling concrete." After receiving Chin's opinion in 1981, Playskool filed its second amended complaint in September 1982 which provided in part as follows:

> "Ragnar Benson materially breached the construction contract by failing and refusing to properly design, construct and install the manufacturing facility in that:
>
> * * *
>
> (e) Concrete columns, ledger beams, double-tee beams and floor slabs, were improperly designed, constructed and installed."

In October 1983 the plaintiff took Chin's deposition again. (It had first taken his deposition in 1980. That 1980 deposition will be referred to later.) In the 1983 deposition Chin testified to his observations in 1981 during the repair work with respect to the topping slabs installed by the defendant. It was at that deposition he testified to what he had found in 1981 and gave his opinion that the work on the floor itself was defective.

We pause in the recitation of the facts and procedural history to identify the deposition of Chin in 1983 as the point at which the plaintiff contends the limitation period began to run. The plaintiff claims that until it heard in 1983 the observations made by Chin in 1981 and the opinion that he formed at that time, it had no reason to believe that the cause of the problems in the Playskool facility was defective work by Kalman.

In November 1983 the plaintiff sought leave to amend its third-party complaint in the Playskool case and add Kalman as an additional third-party defendant. The trial judge denied the plaintiff's mo-

tion because of the possible delay of the trial which was scheduled to begin within a few weeks.

In early 1984, Playskool's action and the plaintiff's third-party claims were tried before a jury. At the conclusion of the cases in chief of Playskool and the plaintiff (defendant and third-party plaintiff in that suit), the court granted all the third-party defendants' motions for directed verdicts. The jury found Benson guilty of both breach of contract and warranty as well as the count alleging fraud and returned a verdict in favor of Playskool of $5,756,475 in compensatory damages and $2,590,414 in punitive damages. Benson settled with Playskool but appealed the judgments in favor of the third-party defendants.

On April 11, 1984, the plaintiff Benson filed this complaint against the defendant Kalman alleging breach of contract, breach of express warranty and the right to contractual and common law indemnity. Benson alleged that Kalman had failed to properly install the reinforcing wire mesh and to insure a proper bond between the filled slab and the precast concrete deck; and that the plaintiff had been found liable to Playskool in an amount in excess of $2,500,000 in damages, some of which was "attributable to defects in [Kalman's] second floor concrete filled slab."

On August 25, 1986, while this complaint was pending, this court affirmed the judgments against Benson and in favor of the third-party defendants. *Playskool, Inc. v. Elsa Benson, Inc.* (1986), 147 Ill. App. 3d 292, 497 N.E.2d 1199.

The judge granted summary judgment and judgment on the pleadings on all counts of this complaint. The plaintiff does not appeal from the orders dismissing its claim for common law indemnity.

■ We will address first the plaintiff's contention that the court erred in granting summary judgment and holding, as a matter of law, that the statutory limitation period had expired. The rule governing summary judgment has been set out succinctly in *Fooden v. Board of Governors* (1971), 48 Ill. 2d 580, 587, 272 N.E.2d 497, 500:

> "It may be stated generally that if what is contained in the pleadings and affidavits would have constituted all of the evidence before the court and upon such evidence there would be nothing left to go to a jury, and the court would be required to direct a verdict, then a summary judgment should be entered."

■ The rule governing directed verdicts, the *Pedrick* rule, has been repeated so often that citation is not required: A verdict should not be directed unless all the evidence, when viewed in its aspect most favorable to the party opposing the motion, so overwhelmingly

favors the movant that no contrary verdict based on that evidence could stand.

Two preliminary questions must be resolved before we may discuss the underlying question of whether the evidence shows the existence of a material fact which could be resolved only by a jury. The first question is what is the appropriate rule governing time limitations in construction contract actions? The defendant says that under the appropriate rule the time for bringing a *third-party action* begins when the underlying complaint against the third-party plaintiff is filed. It also contends that this rule is different from the "discovery rule." In support of its position the defendant cites *Hartford Fire Insurance Co. v. Architectural Management, Inc.* (1987), 158 Ill. App. 3d 515, 511 N.E.2d 706, and *La Salle National Bank v. Edward M. Cohon & Associates, Ltd.* (1988), 177 Ill. App. 3d 464, 532 N.E.2d 314. At issue in both those cases was whether a third-party action involving a construction contract was subject to section 13—204 (Ill. Rev. Stat. 1983, ch. 110, par. 13—204), which provides that in actions for contribution among joint tortfeasors, the limitation period begins when the party seeking contribution has made payment to discharge his own liability, or to section 13—214 (Ill. Rev. Stat. 1983, ch. 110, par. 13—214), which provides that in all actions on construction contracts the limitation period begins when "the person bringing the action knew or should reasonably have known of the fact or omission" upon which he bases his claim. Both cases held that section 13—214 applied. We do not read those cases as pronouncements of so broad a rule that the time for filing a third-party action is automatically triggered by the filing of the underlying complaint.

■ We believe the appropriate rule applicable to all construction contracts has been set out by the supreme court in *Knox College v. Celotex Corp.* (1981), 88 Ill. 2d 407, 430 N.E.2d 976. In exposition of the rule, the court adopted the rationale of a medical malpractice case, *Witherell v. Weimer* (1981), 85 Ill. 2d 146, 421 N.E.2d 869, and a product liability case, *Nolan v. Johns-Manville Asbestos* (1981), 85 Ill. 2d 161, 421 N.E.2d 864. Based on the reasoning of those cases the supreme court held as follows:

"At some point the injured person becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved. At that point, *under the discovery rule*, the running of the limitations period commences." (Emphasis added.) *Knox College*, 88 Ill. 2d at 416.

With that "discovery rule" as our guideline, we posit the question

before us thus: When should Benson reasonably have known facts that would require Benson to take steps to determine whether Kalman had in fact been negligent?

The next question that we must address is what may properly be considered by the court on a motion for summary judgment.

▬▬ In support of the motion for summary judgment, the defendant adopted portions of the appellate court opinion in *Playskool* as findings of fact. The plaintiff's response contended that it was improper for the defendant to rely on the appellate court opinion to establish the existence of "certain facts." In its reply the defendant referred to specific testimony heard in the *Playskool* trial and attached as exhibits portions of the report of proceedings containing that testimony. The record does not disclose that the plaintiff made any motion to strike those exhibits. Under the circumstances, the plaintiff may not now complain of the consideration of those exhibits by the trial judge in passing on the motion for summary judgment or their consideration by this court. (*Santschi v. Gorter* (1978), 63 Ill. App. 3d 394, 379 N.E.2d 1383.) Moreover, those exhibits would have properly withstood a motion to strike. We fail to see how a transcript of testimony of a witness at a trial in which Benson participated is entitled to less evidentiary deference than the deposition of that same witness.

The plaintiff has argued at great length here that the trial judge improperly considered the appellate court opinion in *Playskool*. In fact, it says that "whether Kalman had any right to try the issues presented in its dispositive motions by the wholesale use of excerpts from the *Playskool* trial transcript and the *Playskool* opinion of this court" is "the primary legal issue present on this appeal."

We disagree that the *Playskool* opinion itself is an issue at all, because we are unable to determine what precisely in the *Playskool* opinion the judge allegedly considered that was not also in the excerpts of trial testimony; and the plaintiff has not pinpointed any "fact" in its brief that the trial judge accepted from the opinion. The colloquy between the judge and counsel before he made his findings and later when he denied the motion to reconsider are of little assistance to us in determining what "facts" the judge allegedly improperly considered. We note that the judge said he was not basing his ruling on the *Playskool* opinion alone. It is the burden of the appellant to show error; and it has not done so. (See *Thanopoulos v. Pickens* (1980), 87 Ill. App. 3d 906, 409 N.E.2d 477.) Before leaving this point, we wish to make two observations: First, a court may take judicial notice of adjudications of ultimate fact made in a court of review (see *Walsh v. Union Oil Co.* (1972), 53 Ill. 2d 295, 291 N.E.2d 644); and,

second, there is no "fact" recited in the *Playskool* opinion that is germane to this case that is not properly before us from other sources.

Finally, insofar as summary judgment is concerned, we may address what we deem to be the primary issue: May it be said, as a matter of law, that Benson should have been alerted, at least two years before filing this action, to the fact that Kalman's work might have been defective? We conclude that it may and should be said, as a matter of law, and that summary judgment was properly granted.

At this point we must address what we perceive to be the principal thrust of the defendant's argument: Benson was responsible for the overall construction and "was responsible to insure that composite action was achieved at the connection of the second floor slab and the double-tee flanges." Therefore, it knew or should have known of the defective work of Kalman, and, consequently, the statute began to run at that point. We believe that the defendant has misconstrued the application of the rule which places ultimate responsibility on a general contractor to *the owner of property* in determining liability for things done by a subcontractor which the contractor knew or should have known. The defendant's main argument is that since the plaintiff failed to detect the defective work done by Kalman at the time the mesh was placed in the concrete and the slab was placed over the concrete form, it negligently permitted the work to be done improperly or negligently failed to detect that the work was done improperly. That interpretation would mean that, since the general contractor is charged by law with ultimate responsibility, the time for filing an action he might have against a subcontractor begins when the defective work is done because the general contractor should detect it. We must reject this interpretation of the defendant. To accept it would render the discovery rule meaningless in actions by the general contractor against its subcontractors.

In short, the knowledge, actual or imputed, creating liability of the contractor for the acts of its subcontractor, is not necessarily the same knowledge of the contractor governing the limitation period. We hasten to make clear, however, that we are not saying that what knowledge a general contractor had, or should have had, at the time the work was done is never probative; we are saying that it may not necessarily be conclusive. In this case, Benson acknowledges that it was responsible for the day-to-day supervision of the work; that Benson's superintendent would have been "on the job" when Kalman placed the topping on the second floor; and that, if Kalman failed to properly pour the floor, Benson's superintendent should have said something at that time.

Before beginning a discussion of the sufficiency of the evidence, we wish to observe that the plaintiff's briefs have been so heavily involved in the extraneous question of the *Playskool* opinion that we have had to search the record ourselves for an adequate understanding of the facts. Those facts are as follows:

When Benson was first contacted by Playskool about the cracks and spalling, after examination, Benson came to the opinion that the cracking was the result of heavy loads on a forklift truck rolling over the floor; and its opinion of the cause of the spalling from the ledger beams was the "inadequate length of the bearing, the rough surface of the ledger beam, and the lack of a [resilient] pad."

Midwest, which had the responsibility for the design and fabrication of the columns and ledger beams, came to the opinion in April 1975 that the cracks were due to shrinkage in the concrete topping.

In April 1974 Kalman saw cracks "over almost every joint in the pre-cast tee panels." Its "guess" at the cause of the cracks was that "perhaps this piece of floor was used too soon." Kalman expressed the belief that the "concrete should not shrink that much." It noticed another badly cracked area in front of the truck docks, and it was Kalman's opinion that the cracking was caused by settlement.

Kalman, Playskool and Benson met on April 12, 1974, and it was determined that the separation between the wall and the slab on the second floor had to do with the structure. At that time Kalman agreed with Playskool that Kalman would attempt to fill the cracks with epoxy.

On February 26, 1976, Benson demanded that CST repair the damages which resulted from "deficiencies of [CST's] installation." CST examined the facility and acknowledged that it was Benson's opinion that CST was responsible; but CST did not agree and decided to hire an independent structural engineer, Erich Mees.

Mees examined the site in March 1976 and found that "a serious structural distress condition existed." He listed four causes of the cracking:

(a) The building did not allow for expansion joints on the second floor.

(b) There were no bearings between the double-tee and the concrete.

(c) The bearing elevation of the double-tees was too short.

(d) The alignment between the double-tees and the concrete bearing ledges was very poor.

Joseph Pfendt, vice-president and general manager of Benson, told Playskool in 1976 that the spalling was caused by a forklift truck;

but a week later he told CST that there were different causes for the problem.

James Ratzer, Benson's head of the structural department, examined a hole in the concrete on the second floor in March 1975. Most significantly, he thought that the hole could have been caused by a lack of composite action. He could not recall anything being done to further investigate the problem but he recognized that "if the composite action between the two was not attained, this could contribute to a weaker condition." When asked whether Benson did anything to determine whether the surface of the tees was roughened, which would improve bonding, which, in turn, would improve composite action, Ratzer replied, "I did not do anything." He believed he looked at the broken pieces of the double-tee flange in 1975 but he did not ask anyone to examine it. When asked if he inquired about the condition of the surface of the broken piece, Ratzer stated, "I do not remember making any inquires, no." He said that nothing was done to determine if the problem was caused by failure of the composite action.

Although the double-tees began fracturing in early 1975, Benson took no steps to determine whether the double-tees which had broken were capable of carrying the required 175 pound per square foot design live-load. Lewis Townsend, vice-president of engineering at Benson, testified that he "did nothing" in 1975. He did not even ask Ratzer his opinion regarding the cause of the failure. Townsend knew the slab and double-tees needed composite action, but he failed to examine the broken flanges or broken floor to see whether the mesh was properly located or the bonding agent was present or whether composite action had been obtained. Townsend testified, "I did not instruct anyone how to proceed." He did not ask anyone to look at the composite action because he "could not determine that that was the cause of the hole." He was asked whether Benson had the obligation to find out why there was a hole in the floor. He answered, "No." When asked why Benson believed it had no obligation to inquire further, Townsend replied, "There is no answer to that." Benson filled the hole with cement.

When the problem first arose in 1974, Benson, as we have previously noted, raised the lack of a resilient bearing pad as a possible cause of the spalling; and yet, Pfendt testified, even when Benson discovered that bearing pads had been omitted, and Pfendt admitted that Benson's superintendent should have seen that, Benson did not report that fact to Playskool. Benson would not do corrective work because Playskool would not pay for it.

At his deposition in 1980, Ian Chin, who had been retained by

Playskool in 1979, testified that a vertical crack at the ends of a pre-cast, pre-stress member was a very serious indication of a "probable failure." The spalled end of a pre-stress, pre-cast member indicates *a weak area within the concrete*. The situation was potentially very dangerous, and he became alarmed. He was told by Playskool that some of the cracking at the ends of the double-tee members was "pretty severe" and that something should be done as soon as possible. He conducted core sample tests of the ledger beams. He fabricated a test beam similar in make-up to the beams at the Playskool facility. The condition of the ledger beams when he examined them was "really appalling." He made it clear that he had been hired by Playskool to do something as quickly as possible for safety reasons. *He had not been hired to determine the cause of the cracking and spalling on the ledger beams*. However, he said that he had received sufficient information to permit him to make a "cause-and-effect evaluation" *except in one area: reinforcement of the concrete*. He was asked how he would go about obtaining the information he would need regarding reinforcement and he made this answer:

"In a non-critical area of the ledger beam, the way I would do it would be to remove the concrete to actually examine the reinforcing steel within the member rather than depending on the contract documents."

We recognize that Chin was talking about ledger beams and not the floor. But his deposition testimony was probative to establish, first, the gravity of the problem, which included danger to life; second, that he was not retained to solve the overall problem but rather to correct the dangerous condition; and third, that if there was any suspicion of the stability of concrete, the concrete should be removed. Therefore, the more dangerous the situation, the more compelling would be activity on the part of the general contractor to solve and alleviate the problem. The fact that Chin was not hired to attempt to solve the problem should have alerted Benson to the fact that it should hire an expert for that purpose. In this regard, it should be pointed out that Mees also made it clear that he was hired for a limited purpose. He said that his report was "prepared only in reference to the bearing distress condition" and that he had "not checked the individual members nor the overall stability of the structure." He had been hired by CST, which understandably was concerned only with its own liability. Finally, the removal of the concrete as suggested by Chin in his 1980 deposition could have been done by Benson in 1980, just as it was later done by Chin in 1981.

Although Benson knew or should have known that Chin was doing

more work for Playskool in 1981, it took no steps to keep abreast of the results of his work. If it had, it would have learned precisely what he did. He testified in 1983 regarding the proper way to test the floor: If he wanted to know whether the second floor could sustain 175 pounds per square foot, he would expose the tops of the tees. If he did not find deliberately roughened top surfaces of the tees to engage the topping slab and let it achieve composite action, then he would analyze the tees as if they were non-composite members and calculate the actual load capacity. He emphasized that, based on observations made in 1981, he knew the composite action and mesh reinforcement were improper.

We wish to make our position clear on this aspect of the evidence given in 1983: It was germane to show that no insurmountable burden was placed on the shoulders of Benson if it sought to determine the cause of the cracking and spalling. We repeat, it could have done precisely what Chin did.

Benson finally did retain an expert, Eugene Holland, after the *Playskool* trial. Holland had testified as an expert for Playskool at that trial in which he said that the cracks had structural significance because it meant that there was no composite action because there was no bonding:

"Well, the first indication, the first structural significance is that when the slab is cracked, that means it slipped, that means it has slipped off the flange and there is absolutely no resistance to this kind of movement *** to the sliding, no composite action whatsoever when the slab is cracked."

The inescapable conclusion is that Benson could have received that opinion in 1977.

The lack of composite action was the principal cause of the problem since lack of composite action permitted movement of the floor. A fair question would be: Did Benson have any reason to believe that composite action was lacking? The answer is that it did. In 1974 Kalman reported that "something appears to be moving, and we believe it is either the wall or the structure." On February 26, 1976, Midwest reported to CST that a cause of the cracking "was possibly due to build-up of lateral forces from movement in the double-tee floor system." And we repeat that Ratzer, Benson's head of the structural department, examined the hole in the second floor in March 1975, and thought the hole could have been caused by a lack of composite action.

There is one final illustration of the casual attitude adopted by Benson. The original complaint filed by Playskool against Benson

made no allegations of negligence insofar as any of the components of the second floor were concerned. In spite of that lack of specificity, Benson was diligent enough to name CST, Midwest and Blakeslee in a third-party complaint. Playskool's first amended complaint added that "concrete beams and columns have cracked and failed resulting in a condition of spalling concrete." The concrete beams and columns, Benson could argue, were the responsibility of CST, Midwest and Blakeslee, and not Kalman. But Playskool filed its second amended complaint in September 1982 and alleged defects in the "concrete columns, ledger beams, double-tee beams and *floor slabs*." (Emphasis added.) Benson had to know that that allegation was directed at work done by Kalman; and yet, Benson took no steps to determine .why Playskool had so amended its complaint until 13 months later when it resumed the deposition of Chin.

The entire record displays a pattern of finger-pointing, an overriding concern for economy and inertia on the part of Benson, particularly inertia. It first blamed Playskool, then it blamed CST, then it added Blakeslee and Midwest. Opinions as to the cause of the cracking and spalling abounded, but Benson was content to let Playskool and Midwest bear the cost of hiring experts in an attempt to solve the problem, despite the fact that as general contractor it had the ultimate responsibility for the construction of the building. The answer of Townsend, Benson's vice-president, sums up the attitude taken throughout by Benson: He denied that Benson had any obligation to find out why there was a hole in the floor.

Determining at what point a party becomes possessed of sufficient information to be under an obligation to inquire further may be a question of law. (See, *e.g., Tramutola v. Rott* (1987), 156 Ill. App. 3d 151, 509 N.E.2d 657; *Conley v. Springfield Clinic* (1985), 130 Ill. App. 3d 369, 474 N.E.2d 421.) While Kalman has the burden of establishing a statute of limitations defense (*Calumet Country Club v. Roberts Environmental Control Corp.* (1985), 136 Ill. App. 3d 610, 483 N.E.2d 613), Benson has the general burden of proof under the discovery rule. Once Kalman introduced sufficient evidence which, if uncontradicted, would entitle it to judgment as a matter of law (*Motz v. Central National Bank* (1983), 119 Ill. App. 3d 601, 456 N.E.2d 958), Benson then had the burden of proving that the date of discovery came within the "discovery" exception to the statute of limitations. (See *Blair v. Blondis* (1987), 160 Ill. App. 3d 184, 513 N.E.2d 157.) It is our judgment that Benson failed to meet that burden here, as a matter of law, and that the court properly granted summary judgment. In view of our holding, it is not necessary that we consider

whether the court properly entered judgment on the pleadings.

Before this opinion is concluded, there is one other matter to be discussed. The 1980 deposition of Chin was not mentioned in any of the briefs. It was first called to our attention by the attorney for Kalman during oral argument. We questioned the attorney for Benson about the effect of Chin's 1980 deposition. After oral argument, we granted Benson's attorney permission to listen to the tape of the argument. Subsequently, we granted leave to Benson's attorney to file a reply to the oral argument and leave to Kalman's attorney to respond. After listening to the tape ourselves and considering the reply and response, we wish to make it clear that no misrepresentations were made to us. In addition, we cannot accept the argument of Benson's attorney that we should not consider the 1980 Chin deposition. One reason is that it was Benson's attorney who made Chin's 1980 deposition part of its motion for summary judgment, and it was he who filed Chin's deposition as a supplemental record in this court. Another reason is that the deposition was probative for reasons we have already explained. It is true that the deposition should have been called to our attention in the briefs, but, to paraphrase Justice Frankfurter, knowledge, like wisdom, should not be rejected because it comes late. *Henslee v. Union Planters National Bank & Trust Co.* (1949), 335 U.S. 595, 600, 93 L. Ed. 2d 259, 264, 69 S. Ct. 290, 293 (Frankfurter, J., dissenting).

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA, J., and LaPORTA,* J., concur.

---

*Justice LaPorta participated in this opinion after the resignation of Justice Quinlan, who had participated in the oral argument. Justice LaPorta has read the briefs and listened to a tape of the oral argument.

Ledger beam

bearing Ledge

area of spall (failure) of ledger beam

Column

Stem of double T bearing on Ledge — also shows the bearing surface

APPENDIX I

C 3330