LA SALLE NATIONAL BANK, as Trustee, Plaintiff-Appellant, v. SKIDMORE, OWINGS AND MERRILL *et al.*, Defendants (McNulty Brothers Company, Defendant-Appellee).

First District (4th Division)   No. 1—92—2343

Opinion filed May 5, 1994.

Leonard S. Shifflett and Timothy S. Harris, both of Wilson & McIlvaine, of Chicago, for appellant.

Gardner, Carton & Douglas, of Chicago (Michael E. Barry and William H. Anderson, of counsel), for appellee.

PRESIDING JUSTICE CAHILL delivered the opinion of the court:

We reverse a summary judgment where the trial court found, as a matter of law, that the owners of the Apparel Center in Chicago (Center) knew or should have known not later than 1977 that the

heating problems that plagued their building were wrongfully caused. Suit was not filed until 1986, outside the four-year statute of limitations if the date fixed by the trial court is correct. We disagree, finding that the facts before us do not lead to the conclusion, as a matter of law, that the statute was triggered no later than 1977. To so hold imposes upon laymen a legal conclusion that virtually requires a prudent businessman involved in complex, multi-year construction to keep a lawyer at his elbow from the day ground is broken. That may be, in fact, what prudent businessmen do in this era. But the law is not so stern an arbiter. What may or may not be wrongfully caused, as our supreme court has read the discovery rule, is rooted in common sense. If a roof collapses half way through construction, a court can fix the date, as a matter of law, when the injury is known to be wrongfully caused. Some construction defects lend themselves to such a precise finding, as a matter of law. Many do not. For these, fixing a date an injury is known to be wrongfully caused is a question of fact. We believe what happened at the Apparel Center from 1976 through 1986 is such a case.

La Salle National Bank (Bank) entered into a construction management contract with Tishman Construction Corporation of Illinois (Tishman) to build the Apparel Center. In May of 1974, Tishman contracted with McNulty Brothers Company (McNulty). McNulty purchased and installed the insulation and firesafing materials in the Center. The Center was designed with a unique heating system which relied significantly on the heat generated by the lights within the Center. Heat generated by the lights was circulated by electric fans. McNulty substantially completed its work on the Apparel Center by September of 1976, but did not finish work under the contract until May of 1977.

Tenants began to occupy the Center in late 1976. Almost immediately, in the winter of 1976-77, the Bank received complaints from the tenants that the Center was too cold. The Bank investigated to determine the cause of these temperature problems. The investigation was ongoing from 1976 to 1978. The Bank received advice or information about the problem from at least five separate sources: (1) investigations by their own employees which included cutting holes in some of the interior walls to examine the insulation; (2) consultations with the Center's architects, Skidmore, Owings and Merrill (Skidmore); (3) consultations with McNulty, the defendant in this appeal; (4) a 1977 report issued by U.S. Gypsum, the manufacturer of the insulation used in the Center; and (5) a study by an independent engineering consultant, Environmental Systems Design, Inc. (ESD), issued in March of 1978.

These sources gave the Bank numerous and in some cases contradictory reasons for the temperature problems in the Apparel Center. In response, the Bank undertook numerous repairs, including repairs to the insulation in selected locations throughout the Center. These repairs alleviated the temperature problem somewhat, but tenant complaints continued. In 1980 and 1981, the temperature problems persisted.

There is no evidence in the record on the status of the temperature problem in 1982, 1983 and 1984. In 1985, however, in response to an increase in utility rates, the Bank commissioned an independent consulting agency to study the entire heating and cooling system in the Center. Based on the consultant's report, the Bank hired an engineering firm, Wiss, Janney, to investigate further. Wiss, Janney opened holes in the interior and exterior walls of the Center and discovered, among other things, that the insulation did not conform to specifications in the building plans and that the insulation had been improperly installed.

The Bank filed suit on August 25, 1986, against several defendants. The defendants moved for summary judgment based on the statute of limitations, arguing that the Bank had sufficient information of faulty construction more than four years before the filing of the complaint. Without setting a specific date, the trial judge found that the statute was triggered sometime in 1976-77 and entered summary judgment for the defendants. The trial judge denied a motion for reconsideration, and the Bank appealed.

The Bank contends that summary judgment was improper for two reasons: first, none of the evidence presented by defendant at the hearing addressed the Bank's allegations of defective flashing on the exterior wall of the Center; second, there were disputed questions of fact relating to the Bank's knowledge of defects in the building. The Bank contends that the information gathered from 1976-78 led it to believe that the temperature problems were caused by minor defects commonly discovered in the first several years of a new building. The Bank argues that the statute of limitations did not begin to run until it received the information from the study and investigation conducted in 1985. McNulty responds that the information available in 1976-78 was enough to trigger the statute of limitations, and that the later studies found nothing different from or in addition to the earlier investigation.

We do not agree with the Bank's second argument that there are disputed questions of material fact relating to the Bank's knowledge of the alleged faults. We do find, however, that more than one conclusion can be drawn from these undisputed facts. The trier of

fact should therefore determine if the Bank's knowledge triggered the statute of limitations. This conclusion makes consideration of the Bank's first argument unnecessary.

■ Section 13—214 of the Illinois Code of Civil Procedure provides: "Actions based upon tort, contract or otherwise against any person for an act or omission of such person in the design, planning, supervision, observation or management of construction, or construction of an improvement to real property shall be commenced *within 4 years from the time the person bringing an action, or his or her privity, knew or should reasonably have known of such act or omission.*" (Emphasis added.) Ill. Rev. Stat. 1991, ch. 110, par. 13—214(a) (now 735 ILCS 5/13—214(a) (West 1992)).

■ The Illinois Supreme Court has interpreted the knowledge requirement or "discovery period" in the statute of limitations in construction cases to begin when a person knows or reasonably should know of his injury *and* when a person knows or reasonably should know that it was wrongfully caused. (*County of Du Page v. Graham, Anderson, Probst & White, Inc.* (1985), 109 Ill. 2d 143, 153-54, 485 N.E.2d 1076, 1080; *Knox College v. Celotex Corp.* (1981), 88 Ill. 2d 407, 415, 430 N.E.2d 976, 980.) Persons have knowledge that an injury is wrongfully caused when they possess enough information about the injury to alert a reasonable person to the need for further inquiries to determine if the cause of the injury is actionable at law. *Knox College*, 88 Ill. 2d at 415-16; *AXIA, Inc. v. I.C. Harbour Construction Co.* (1986), 150 Ill. App. 3d 645, 501 N.E.2d 1339; see also *Nolan v. Johns-Manville Asbestos* (1981), 85 Ill. 2d 161, 421 N.E.2d 864; *Witherell v. Weimer* (1981), 85 Ill. 2d 146, 421 N.E.2d 869 (*Knox* explains this holding as a compromise between a limitations period triggered when you learn of an injury and one triggered when you learn you have a cause of action).

Appellate review of an order granting summary judgment is *de novo.* (*Outboard Marine Corp. v. Liberty Mutual Insurance Co.* (1992), 154 Ill. 2d 90, 607 N.E.2d 1204.) Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1991, ch. 110, par. 2—1005(c), now 735 ILCS 5/2—1005(c) (West 1992); *Ralls v. Glendale Heights* (1992), 233 Ill. App. 3d 147, 598 N.E.2d 337.) To determine if there is a genuine issue of material fact, the court examines the pleadings, together with any depositions, admissions, or affidavits on file. All inferences from the facts are drawn in favor of the party opposing the summary judgment motion. *Ralls*, 233 Ill. App. 3d at 151.

Fixing a date of discovery that triggers the statute of limitations

is generally a question of fact inappropriate for summary judgement. (*Knox College*, 88 Ill. 2d at 416; *Nolan*, 85 Ill. 2d at 171; *Witherell*, 85 Ill. 2d at 156.) But, summary judgment may be appropriate if two conditions are met: the facts known by the plaintiff are not in dispute, and only one conclusion can be drawn from them. *Betts v. Manville Personal Injury Settlement Trust* (1992), 225 Ill. App. 3d 882, 588 N.E.2d 1193; *Nolan*, 85 Ill. 2d at 171.

Because this suit was filed on August 25, 1986, the four-year discovery period for this action commenced on August 25, 1982. When we apply this standard of review to the case before us, summary judgment would be proper if only one conclusion can be reached from the undisputed facts: that the Bank possessed enough information before August 25, 1982, to alert a reasonable person to the fact that its injury was wrongfully caused.

Ample evidence exists in the record of the Bank's knowledge of possible causes of the heating problems. The following is a summary of the information which can be isolated from the record:

(1) Investigations by the Bank's own employees. Several Bank employees testified that throughout 1976 and 1977 and later they opened walls at several locations in the Center. They discovered areas where the insulation had fallen from its original position. They discovered at least one area where the firesafing was out of place. These problems were thought to be at least a contributing cause of the temperature problems. Repairs were made where gaps were found in the insulation.

Employees also identified the failure of electric heaters, the failure to erect walls to prevent air flow, and the Center's revolving doors as possible contributors to the temperature problems in the lobby and throughout the building.

(2) Skidmore, Owings, and Merrill, the architects of the Center. The Bank corresponded with them in late 1976 and early 1977. Skidmore recommended several ways to supplement the heat-by-light system, but concluded that most of the problems were caused by space heaters that were not operating and because the installation of the insulation had not been completed. As late as February of 1979, an architect associated with Skidmore attributed the heating problems to "air infiltration" but did not conclude that the insulation was defective.

(3) McNulty Brothers Company. The Bank asked McNulty to investigate the heating problems. McNulty did so and then wrote a letter dated January 3, 1977, to Tishman outlining his conclusions. McNulty stated: "I believe a great deal of the present problem arises from the fact that the building is not being heated in accordance

with the original design criteria which took advantage of full lighting of all of the spaces on each floor." Essentially, McNulty concluded that the problems were caused by the failure of tenants to keep their lights on long enough to generate enough heat.

(4) U.S. Gypsum. McNulty asked U.S. Gypsum for its opinion of the problems at the Center. In a letter dated January 7, 1977, to Tishman, a manager at U.S. Gypsum described an inspection of some of the interior walls at the Center. The manager noted that in a number of locations insulation was dislodged from its proper position in the wall cavity. The manager concluded: "In almost every case the displaced insulation corresponded to areas where wallboard had been removed to accommodate electricians who were putting in additional outlets. I would surmise that in placing the boxes and conduit the electricians displaced the insulation." He noted that McNulty's decision to seal the perimeter of the electrical boxes "will solve the problem of air leakage, whatever this effect might be on comfort level."

(5) Environmental Systems Design, Inc. In 1978, ESD conducted a study of the operational systems of the Center for the purpose of evaluating the heat-by-light system. In a portion of their report, ESD acknowledges the existence of "some cold spots" in the building. As an experiment, ESD chose one room with temperature problems and injected additional insulation between the precast concrete and the drywall. This change improved the air temperature in the room from 65 degrees to 75 degrees. As one of their conclusions, ESD suggested: "Check the insulation between the drywall and the precast. Add insulation in the void space, if necessary ***."

Except for minor discrepancies, we find that the parties agree on the material facts relating to what the Bank knew and when. But when we review these facts, we must then decide whether, as a matter of law, the Bank knew enough to cause a reasonable person to believe the heating problems were wrongfully caused. The Bank was given conflicting explanations for the temperature loss: some pointed to actionable conduct by some of the contractors and subcontractors who participated in construction. Others pointed to a failure of the Apparel Center employees and tenants to follow procedures that would insure efficient operation of the heat-by-light system. That some explanations for the temperature problems may have been actionable, while others pointed to the gremlins in any new, complex construction or the failure of the Bank itself to follow procedures, does not trigger the statute. The statute is triggered when a person has in hand sufficient facts such that a reasonable person knows or should know the problem is wrongfully caused.

The record supports the conclusion that no later than 1977 the Bank knew that its problems might be wrongfully caused, but, on the other hand, might not be. Nowhere in our supreme court decisions does the phrase "might be wrongfully caused" appear as a standard that triggers the statute. None of the evidence available to the Bank before 1985 pointed to insulation that did not meet the specifications of the contract. There was evidence that the insulation was missing in certain areas, but the Bank was presented with the explanation that the installers of the electrical outlets caused these problems. Further, the Bank presented the unrebutted testimony of an expert who testified that the displacement of insulation in isolated spots was common to newly constructed buildings and not below industry standards.

The evidence available to the Bank from 1976 to 1979 must be compared with the final results of the investigation in 1985. Among other findings, Wiss, Janney concluded that the firesafing was defectively *installed* and that the insulation material did not conform to the manufacturer's specifications. These findings are clear evidence of a breach of contractual duties, as opposed to mere equipment failures or maintenance problems.

The supreme court has considered cases where conflicting reasons for an injury have been given to a potential plaintiff. In *County of Du Page v. Graham, Anderson, Probst & White, Inc.*, the county knew of moisture problems with a county building constructed by Graham eight years before a complaint was filed alleging faults in construction. (*Graham*, 109 Ill. 2d at 153-54.) The architect had provided explanations for the moisture problems which were not actionable. In reversing the trial court's order dismissing the action, the supreme court wrote: "It is possible that the suggestions of the architect and the resulting repairs were adequate to keep a reasonable person from investigating further." (*Graham*, 109 Ill. 2d at 154.) In the present case, it is possible that the several nonactionable explanations for the heat loss were enough to assuage the Bank's concern over the cause of the heating problem.

In *Society of Mt. Carmel v. Fox* (1975), 31 Ill. App. 3d 1060, 335 N.E.2d 588, *appeal after remand* (1980), 90 Ill. App. 3d 537, 413 N.E.2d 480, the Society of Mt. Carmel sued their architect, Fox, for faulty construction of a school. Cracks and defects in the building were noticed more than five years before the complaint was filed. The architect, however, attributed the cracks to mere "maintenance problems." The plaintiff conducted repairs of these maintenance problems. Later, the plaintiff received a report concluding that the cracks were caused by defects in the design of the building. The court

held that the statute of limitations should be computed from the date of discovery of the design defect, rather than the date when the plaintiff knew of the cracks in the building. *Society of Mt. Carmel*, 90 Ill. App. 3d at 538-39.

■ As in the above cases, the Bank here was given numerous non-actionable explanations for the heating problems of the Apparel Center, some suggested by the president of McNulty Brothers himself. In cases where the court has found as a matter of law that the statute of limitations barred the action, direct evidence or admissions of actionable conduct were available to the plaintiff which activated the discovery period. (See *AXIA, Inc. v. I.C. Harbour Construction Co.* (1986), 150 Ill. App. 3d 645, 648, 501 N.E.2d 1339, 1341 (extensive water leakage immediately after building was built); *Elsa Benson, Inc. v. Kalman Floor Co.* (1989), 191 Ill. App. 3d 1016, 1019, 548 N.E.2d 485, 487 (construction problems diagnosed as design defects long before plaintiff claimed discovery period began).) When presented with a plaintiff who was given actionable as well as nonactionable explanations for his injuries, we fall back on the reasoning of *Knox*: fixing a date of discovery that triggers the statute is a question of fact inappropriate for summary judgment in most cases. The trier of fact should decide if the information available to the Bank before August 25, 1982, was enough to meet the knowledge requirement promulgated in *Knox* and *Graham*.

Reversed and remanded.

JOHNSON and THEIS, JJ., concur.