WANDA ZACHARY *et al.*, Plaintiffs-Appellants and Cross-Appellees, v. FORREST F. MILLS, Indiv. and as Ex'r of the Instrument Purporting to be the Last Will and Testament of Blanche Hillard, Deceased, *et al.*, Defendants-Appellees and Cross-Appellants.

Fourth District   No. 4—95—0154

Argued September 14, 1995.—Opinion filed January 25, 1996.—Rehearing denied March 1, 1996.

Harlan Heller (argued) and Rodney L. Smith, both of Heller, Holmes & Associates, P.C., of Mattoon, for appellants.

Stephen R. Kaufmann (argued) and Thomas H. Wilson, both of Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield, for appellees.

JUSTICE GARMAN delivered the opinion of the court:

Plaintiffs Wanda Zachary and Sheila Orr appeal an adverse jury verdict in the circuit court of Clark County in their action contesting the validity of the last will of their great-aunt, Blanche Hillard (decedent). Plaintiffs are decedent's sole heirs. They are the daughters of defendant Ruby Orr and decedent's deceased nephew, Keith Orr. Defendant Forrest Mills is decedent's first cousin, and defendants Ruth Arbogast and William Mills are Forrest's children, *i.e.*, decedent's first cousins once removed. Defendant Daniel Arbogast is married to Ruth. Defendants cross-appeal the denial of their motion for sanctions.

Decedent died November 19, 1991, a resident of Casey, Clark County, Illinois. She left a last will dated September 17, 1986. By that will, she gave all her real estate (consisting of two tracts of land and her home) and the contents of her home to Forrest and his wife,

Velma Mills. The remainder of the estate was given in equal shares to Forrest and Velma and to Ruth Arbogast, William Mills, Daniel Arbogast, and Ruby Orr. Forrest was nominated to serve as executor. This will was admitted to probate on December 12, 1991. At the time of her death, decedent was living in a nursing home. In 1991, Forrest was appointed guardian of her person. In 1979, decedent executed a power of attorney appointing Forrest her attorney in fact.

In May 1992, plaintiffs filed a three-count complaint. Velma was ultimately dismissed from the case. Count I as to Forrest alleged that (1) at the time of the making of the will, decedent was under the influence, domination, and control of Forrest, which destroyed her freedom of will; (2) prior to and on September 17, 1986, Forrest had a fiduciary and confidential relationship with decedent and he handled her business and financial affairs, purported to take care of her home, run her errands, and sign checks on her checking account; and (3) Forrest abused that fiduciary relationship and procured execution of the 1986 will, thereby securing for himself and his wife all of decedent's real estate and most of her personal property, as well as having their children, William Mills and Ruth Arbogast, receive a portion of the remainder of the estate. Count II, as to all defendants, alleged that (1) the law firm of Arbogast & Arbogast (consisting of Daniel and his late father, Zollie) prepared the 1986 will; (2) decedent left Daniel a portion of the residue of her estate and made him successor coexecutor, along with Zollie; (3) at the time of the making of the will, decedent was under the influence, domination, and control of Daniel and Zollie, which destroyed her freedom of will; (4) Daniel and Zollie had a fiduciary and confidential relationship with decedent, in that they handled decedent's business and financial affairs, advised her on legal matters and drafted her 1986 will; and (5) during that relationship, Daniel and Zollie abused it by procuring the execution of the 1986 will and secured a substantial benefit for themselves, and for Ruth, Forrest, and Velma. Count III, as to all defendants, alleged that decedent was not of sound mind and memory at the time she executed her 1986 will by reason of age, senility, and other medical conditions.

Prior to trial on the merits, a number of orders were entered by the trial court. Among those relevant to this appeal were orders (1) barring any testimony of plaintiffs and Ruby Orr which would violate the Dead-Man's Act (Act) (735 ILCS 5/8—201 (West 1992)), (2) refusing to allow plaintiffs to amend count II of the complaint to allege violation by Daniel and Zollie of Disciplinary Rules 5—101(a) and 5—103(a) of the Illinois Code of Professional Responsibility (Code) (107 Ill. 2d Rules 5—101(a), 5—103(a)), (3) barring admission into evi-

dence or any reference to seven prior wills executed by decedent between 1966 and 1979, and (4) barring plaintiffs from presenting evidence of any alleged ethical violations by Zollie in preparing a will which benefited a member of his family.

Much of the evidence at trial concerned decedent's mental competence. Since plaintiffs have not appealed the decision of the jury on this issue, we will recount that evidence only as necessary to an understanding of this opinion.

Plaintiffs grew up in the Casey, Illinois, area. Wanda moved away in 1972, and Sheila moved to Tennessee with her mother in 1975. Thereafter, both plaintiffs visited relatives in Casey four or five times per year during the 1970's and early 1980's. They saw decedent during these visits. Plaintiffs testified they were both aware that Forrest was appointed guardian for decedent in 1991, and they had no objection to his appointment because he lived close to decedent and was the best person to care for her.

At the November 1994 trial, witnesses testified that Forrest or Velma usually took decedent to the doctor when needed during the 1980's. Decedent's physician testified that she had some episodes of mental confusion and had arteriosclerosis. He saw decedent several times between 1983 and February 1987, but did not see her or receive any calls from her complaining of any ailments between January 1986 and September 1986. By 1988, decedent was in need of household help. Forrest hired Marcella Finney to be a companion to decedent. She assisted decedent by getting her up in the morning, preparing her meals, helping her bathe, and making sure she took her medication. Finney testified that decedent was sometimes forgetful, but did not seem to be confused. When she saw Forrest and Velma with decedent, they seemed loving and caring toward her.

Other witnesses who had known decedent testified that in their opinion, she was mentally competent in 1986. Two expert witnesses testified as to the possibility of decedent having Alzheimer's disease. Mary Jane Biggs, who also helped care for decedent in 1988, testified that while she was there Forrest came to decedent's house every day or, if he could not come, he would call; he and Velma brought groceries and medicine to decedent. Daniel and Ruth Arbogast were there at times, and they would take over in helping decedent if Forrest and Velma were not available. Another of decedent's friends testified that decedent told her she did not know what she would do without Forrest and Velma.

Kay Cramer testified that she visited with decedent in 1988 or after and she was able to discuss farming matters, such as what was being planted and what yields were in prior years. Kay's husband,

Eugene Cramer, was decedent's farm tenant. He testified that he normally met with decedent two or three times a year regarding farming business. He met with her in 1986, and she did not seem confused. In 1979, he expressed an interest in buying decedent's farm, but she told him plaintiffs were to receive it upon her death and she was not interested in selling. In the fall of 1990, he asked Forrest about the possibility of purchasing the farm. Forrest indicated that "we are supposed to get it" and it was not for sale. He did not say who he meant by "we."

Defendant Ruby Orr testified she moved to Martinsville, Illinois, in 1953. She and her family went to Casey frequently during the 1960's and 1970's. Even after moving to Robinson, Illinois, she and Sheila still made trips to Casey. After moving to Memphis, Tennessee, she returned to Casey three or four times a year.

In light of the trial court's order barring certain testimony by Ruby, plaintiffs made an offer of proof in which Ruby testified that when she traveled to Casey in the mid-1980's she always visited decedent. Decedent's mental condition was bad in 1984 and 1985. At times, she did not appear to recognize Ruby and her daughters and would forget where they lived. Decedent could not remember Ruby's late husband, yet decedent had practically raised him. She thought Sheila's son (born in 1985) was Ruby's child, and they could not make her understand that he was Ruby's grandson. In the summer of 1986, she visited decedent and, at that time, decedent asked Ruby why she took her (decedent's) dishes to Memphis. When she asked decedent to show her what dishes were missing, all her dishes were in the cabinet. Despite this, decedent continued to insist that some of her dishes were missing. In her opinion, decedent would not have been mentally competent to make a will at that time. There had been a big change for the worse in decedent's state of mind since Ruby left the area in 1975. Each time she returned to Casey to visit, decedent's mind had deteriorated a bit more. In the spring of 1986, decedent complained to her that there were people outside her bedroom window planning her death. About 1976, she had a conversation with decedent in which decedent said she intended to leave her house and land to Wanda and Sheila. She also expressed to Ruby that if she had a niece or daughter-in-law, she would have chosen Ruby. Prior to 1980, decedent was a good housekeeper. After that, Ruby noticed that her house was not kept as clean. It was her understanding that Forrest and Velma were being paid to help decedent. The trial court refused the offer of proof.

Elizabeth King, former secretary for the Arbogast law firm from 1985 to 1989, testified that the attorneys at the firm during that time

period were Zollie and Daniel. She identified a copy of a page from the firm's appointment book for September 17, 1986, which reflected the names of people who called and came into the office. Forrest was a client of the firm, and he had an appointment with Zollie that day, as did decedent. She was acquainted with decedent as a client of the office. She recognized a power of attorney form signed by decedent and notarized by Zollie making Forrest decedent's attorney in fact. On September 17, 1986, Forrest brought decedent to the office. She greeted decedent, who then went into Zollie's office alone. The door to Zollie's office closed, and Forrest left the building. Decedent had been in Zollie's office about 15 minutes when Zollie buzzed King on the intercom and asked her to come into his office. She was in the office about 10 minutes. She either took down information that Zollie gave her or he handed her information. She then prepared decedent's will and took it to Zollie. Carole Burris (another secretary) also went in. At no time during this process did anyone else enter Zollie's office. She handed the will to Zollie, who in turn handed it to decedent and asked if the will contained what she wanted. Decedent signed the will, and King and Burris witnessed her signature. King took the will, made copies, and took the original back to Zollie. He gave it to decedent. Forrest picked up decedent when she left the office.

On cross-examination, King testified that the practice at the firm was to write down the name of any person who called. Decedent called to make her own appointment and Ruth Arbogast (who was working there at the time) took the call. She wrote "go pick up Blanche" on the page. Ruth was not there on September 17, 1986, and she did not believe Daniel was there in the afternoon on that date.

Daniel Arbogast was called as an adverse witness. He testified that he and Zollie were partners in their law firm in September 1986. He learned he was a beneficiary under decedent's will sometime in 1989 or 1990. He never discussed it with Zollie prior to Zollie's death in November 1989. Daniel told Ruth that they were beneficiaries, but he did not say anything to Forrest. Daniel was not in the office during the afternoon of September 17, 1986.

Carole Burris testified that Ruth Arbogast worked for the law firm for a period of time as a receptionist. When Burris witnessed decedent's will on September 17, 1986, she believed decedent to be of sound mind and memory. On cross-examination, Burris testified that she has no specific recollection of any conversation when she witnessed the will or of Zollie's questioning decedent in her presence to determine whether it was decedent's will and her wishes.

Clyde Staley testified that he did insurance business with

decedent and he is a friend of Forrest. He did business with decedent in 1986, both in person and by telephone. During that year, decedent maintained three insurance policies with him, and he would have had contacts with her in the spring, summer, and fall of 1986. She did not appear confused and appeared able to conduct her business. Forrest was not present during the times he visited decedent. In 1988, he began to conduct decedent's insurance business through Forrest. He was trustee of a trust, along with Forrest and another man. Zollie did the legal work. They met with Zollie on occasion in connection with their duties as trustees. He identified a trust document signed by him, Forrest, and the other trustee dated September 17, 1986. Decedent's legal business was never discussed during these meetings with Zollie.

After the trial court had entered judgment on the jury's verdict, defendants filed a motion for sanctions pursuant to Supreme Court Rule 137 (155 Ill. 2d R. 137), alleging that the complaint was not well grounded in fact or warranted by existing law. Plaintiffs filed a post-trial motion, asking for a judgment *n.o.v.* or, in the alternative, a new trial. The trial court denied both motions and this appeal followed.

## I. PRESUMPTION OF UNDUE INFLUENCE AS TO FORREST AND ERROR IN GIVING JURY INSTRUCTIONS

Plaintiffs first argue that the trial court erred in ruling that the power of attorney given to Forrest by decedent did not create a fiduciary relationship as a matter of law. At the close of all evidence, plaintiffs moved for a directed verdict as to counts I and II, arguing that the presumption of undue influence had not been rebutted by defendants. The trial court denied the motion, finding that as to Forrest any presumption of undue influence had in fact been rebutted. The court also commented that it did not believe a fiduciary relationship was established under the circumstances of the case by the power of attorney given to Forrest by decedent, where the power of attorney had no connection with the existence of the disputed will. On the other hand, the court also stated it believed any presumption of undue influence growing out of the fiduciary relationship between Forrest and decedent on account of the existence of the power of attorney had been rebutted.

It is well established that a power of attorney creates a fiduciary relationship as a matter of law. (See, *e.g., In re Estate of Maher* (1992), 237 Ill. App. 3d 1013, 1019, 606 N.E.2d 46, 51; *In re Estate of Jessman* (1990), 197 Ill. App. 3d 414, 420, 554 N.E.2d 718, 721; *In re Estate of Savage* (1994), 259 Ill. App. 3d 328, 330, 631 N.E.2d 797,

799, *appeal denied* (1994), 157 Ill. 2d 502, 642 N.E.2d 1281; *In re Estate of Rybolt* (1994), 258 Ill. App. 3d 886, 889, 631 N.E.2d 792, 795, *appeal denied* (1994), 156 Ill. 2d 558, 638 N.E.2d 1116.) The inconsistency of the court's comments are immaterial to a decision on this issue, as we have concluded that plaintiffs' evidence failed to raise a presumption of undue influence by Forrest. More than the mere existence of a fiduciary relationship must be shown to raise a presumption of undue influence in the making of a will. A rebuttable presumption arises where there is proof that (1) a fiduciary relationship exists between the testator and a beneficiary who receives a substantial benefit under the will; (2) the testator is dependent upon the beneficiary; (3) the testator reposes trust and confidence in the beneficiary; and (4) the will is written by, or its preparation procured by, the beneficiary. (*Tidholm v. Tidholm* (1945), 391 Ill. 19, 25, 62 N.E.2d 473, 476; *Anthony v. Anthony* (1960), 20 Ill. 2d 584, 587, 170 N.E.2d 603, 604.) The undue influence must be directly connected with the making of the will, since the gravamen of undue influence is that the intent of the testator is replaced by the intent of the one exerting the influence. Once the presumption has been raised, the burden shifts to the proponents of the will to prove that the influence exerted upon the testator was not so great that the testator's will was overcome. (*Herbolsheimer v. Herbolsheimer* (1977), 46 Ill. App. 3d 563, 566, 361 N.E.2d 134, 136.) Decedent and Forrest had a fiduciary relationship by virtue of the existence of the power of attorney and because of their personal relationship. Decedent was dependent to a degree upon Forrest, and it appears from the evidence that her trust and confidence in him were long-standing. We note that one of the exhibits admitted into evidence at trial was a written and notarized statement by decedent dated February 15, 1973, expressing concerns about her health and stating that should she become incompetent at some time in the future, she would want Forrest to act as conservator of her estate. Evidence at trial indicated that Forrest assisted decedent in her daily living both before and after the will was executed. It is undisputed that Forrest received a substantial benefit under the will. However, the evidence does not show that Forrest procured the preparation of the 1986 will. While it is conceded that he drove decedent to Zollie's office on September 17, 1986, he was not present when the will was discussed or executed. In fact, he was not even in the building. Decedent made her own appointment with Zollie for that day. She wrote the check to pay for Zollie's legal services, and the original will was given directly to her by Zollie after it was executed. Evidence showed that during this period, decedent wrote her own checks and handled her own farming and insurance busi-

ness. Plaintiffs point to Forrest's 1990 conversation with Eugene Cramer in which he stated that "we" are to get the farm. Had that conversation been contemporaneous in time with the execution of the will, this evidence, coupled with Forrest's transporting decedent to Zollie's office, might be sufficient to suggest that he had somehow procured the will. However, it is difficult to place much significance upon a conversation which took place four years after the contested will was executed.

This case is similar to *Anthony*, where the beneficiary, who was the testator's daughter, lived with him, took care of his physical needs, and handled all of his business and financial affairs. She drove him to his attorney's house to discuss the will, but was not present during the discussions. She also drove him to the attorney's office on the day the will was signed and remained in the outer office while the will was executed. On appeal from a verdict in the daughter's favor, the supreme court found that while the evidence showed the beneficiary had a fiduciary relationship with the testator, he reposed trust and confidence in her, and he depended upon her, it failed to show she had procured the will. Thus, no presumption of undue influence was raised and the evidence failed to show any such influence. *Anthony*, 20 Ill. 2d at 587, 170 N.E.2d at 604.

Thus, we hold that no presumption of undue influence was raised and the court did not err in refusing to direct a verdict on count I of the complaint.

■ Plaintiffs also argue that the trial court erred in failing to give one of their tendered jury instructions as to count I. That instruction was based upon Illinois Pattern Jury Instructions, Civil, No. 200.03 (3d ed. 1990) (hereinafter IPI Civil 3d), the will contest instruction to be given when plaintiff relies on the presumption of undue influence. However, since we have found that no presumption of undue influence was raised by the evidence, it follows that the trial court did not err in refusing this instruction as to Forrest.

## II. PRESUMPTION OF UNDUE INFLUENCE AS TO ZOLLIE AND DANIEL ARBOGAST AND ERROR IN GIVING JURY INSTRUCTIONS

Plaintiffs argue that a presumption of undue influence was raised because Zollie prepared the contested will and his son and law partner, Daniel, received a benefit under the will. They further argue that the evidence at trial did not serve to overcome this presumption. They believe the trial court erred in refusing to direct a verdict as to count II of their complaint. They point out that all beneficiaries except Ruby Orr were members of the Arbogast family or related to

that family by marriage. Defendants dispute that any presumption was raised because the benefit under the will was to Daniel and he had no role in preparing the will.

Although we conclude that the trial court did not err in refusing to direct a verdict in plaintiffs' favor as to count II, we hold there was error in failing to give a proper instruction as to Zollie's involvement in the preparation of the will.

In *Franciscan Sisters Health Care Corp. v. Dean* (1983), 95 Ill. 2d 452, 448 N.E.2d 872, Dean (the attorney) drafted the testator's will, in which he received a substantial legacy. He and the testator were long-time friends. After he prepared the will, he had an attorney from another office interview the testator to determine that the will was in accordance with her wishes. In the will contest proceeding, the trial court found the presumption of undue influence had not been rebutted and invalidated the will. On appeal, the appellate court reversed, finding that the presumption had been successfully rebutted. (*Franciscan Sisters Health Care Corp. v. Dean* (1981), 102 Ill. App. 3d 61, 429 N.E.2d 914.) On further appeal, the Supreme Court of Illinois affirmed the appellate court and remanded to the trial court for determination of the factual question of whether undue influence was exercised. In the course of its opinion, the court discussed its views on the propriety of an attorney preparing a will in which he or she receives a benefit:

> "The potential for abuse is great where an attorney drafts a will and stands to benefit from that will. Clients may often depend upon their attorneys for both financial and legal advice. As the relationship of attorney-client grows, a sense of trust develops and is strengthened between the two parties. This trust can be abused by an unscrupulous attorney, and we feel it is usually unnecessary for lawyers to prepare clients' documents under which they benefit. Almost always, a third party is available who can intervene and provide a disinterested perspective.
>
> We therefore feel that as matter of public policy an attorney in such a situation must provide 'clear and convincing' evidence to rebut the presumption of undue influence once it has been raised."
> *Dean*, 95 Ill. 2d at 464-65, 448 N.E.2d at 878.

Other cases have dealt with the issue of an attorney, or a member of the attorney's family, receiving a benefit under a will or other document prepared by the attorney. In *In re Estate of Stuhlfauth* (1980), 88 Ill. App. 3d 974, 410 N.E.2d 1063, the testator insisted upon making her attorney's minor son her sole beneficiary. She was a long-time friend of the attorney and his family. The attorney refused to draft such a will and tried repeatedly to convince the testator that

her only son was the proper object of her bounty. She persisted and ultimately had the will drafted by someone else according to her wishes. When the attorney saw the will, he decided the guardianship provisions should be replaced by trust provisions and prepared a codicil, which the testator later signed, after the drafter of the will reviewed it. The testator's son challenged the will and codicil. The trial court upheld the documents and the son appealed. The appellate court held that the will was properly upheld. However, the trial court's ruling as to the codicil was reversed. The attorney stood in a fiduciary relation to the testator, and he stood to benefit from the codicil if his legal obligation to his son was discharged in part because of the legacy from the testator. He prepared the codicil of his own volition and actively solicited its execution. These facts were sufficient to raise a presumption of undue influence, which was not rebutted by the evidence. *Stuhlfauth*, 88 Ill. App. 3d at 981, 410 N.E.2d at 1068.

In *McFail v. Braden* (1960), 19 Ill. 2d 108, 166 N.E.2d 46, an attorney was hired to give advice to decedent on her real estate. On the attorney's advice, decedent conveyed the tract of real estate to the attorney's secretary and she in turn conveyed it to decedent and the attorney's son as joint tenants. At the time, decedent was reportedly physically and mentally feeble. After her death, her heirs sued the attorney, his son, and the secretary, alleging a violation of the fiduciary relationship between the attorney and decedent. The trial court set aside the conveyances, finding they were for the attorney's convenience and that the son held title in trust for decedent's heirs. The supreme court affirmed, finding there was a fiduciary relationship between decedent and the attorney as a matter of law at the time the deeds were executed, that she did not understand the consequences of what she was doing, and that she had no independent advice. Important factors in determining whether a transaction involving a fiduciary is fair include a showing by the fiduciary that he made a full and frank disclosure of all the relevant information in his possession, consideration was adequate and the other party had independent advice before completing the transaction. *McFail*, 19 Ill. 2d at 117-18, 166 N.E.2d at 52.

There are no reported cases in Illinois holding that a benefit under a will to an adult family member of the preparing attorney constitutes a benefit to the attorney, so that a presumption of undue influence would arise. Plaintiffs have cited a case from Minnesota, *In re Estate of Peterson* (1969), 283 Minn. 446, 168 N.W.2d 502, in which an attorney drew several wills over the years for the testator. In the last few wills, she made some bequests to the attorney's adult chil-

dren, whom she had met only one time many years before. In the final will, she left her entire estate to them, ignoring cousins and close friends to whom her prior wills had made bequests. The trial court refused to admit the will to probate, finding undue influence in its execution. The reviewing court affirmed, noting there were six factors to be considered in a finding of undue influence: (1) opportunity to exercise undue influence, (2) confidential relationship, (3) active participation in the preparation of the will by the party alleged to have exercised influence, (4) disinheritance of those whom decedent would be expected to remember in a will, (5) singularity of the provisions of the will, and (6) the exercise of either influence or persuasion to induce decedent to make the will. The court noted that all six factors were present to some degree in that case. In addition, the court found it unimportant that the attorney's children, rather than the attorney himself, benefited from the will. *Peterson*, 283 Minn. at 448-50, 168 N.W.2d at 504-05.

■ The present case is unlike *Peterson* because, here, the evidence established that decedent knew Daniel Arbogast well. He and Ruth, a first cousin once removed to decedent, helped care for her when Forrest and Velma were unavailable. She appointed Daniel a successor coexecutor in her 1979 will. This case is also unlike the above-cited Illinois cases because, in each of those cases, there was some tangible benefit to the preparing attorney, whether direct or indirect. Here, the only conceivable benefit to Zollie personally was his interest in the welfare of his adult son. This, however, could be found to be a benefit, as any parent could attest. We note in addition, as plaintiffs have pointed out, the relationship between the Arbogast and Mills families. Members of both families received almost all of decedent's estate. We hold that in the unique circumstances presented by this case, a question of fact existed as to whether the bequest to Daniel constituted a benefit both to Zollie and the firm. The existence of this factual question justified the trial court's refusal to grant a directed verdict or to enter judgment in favor of plaintiffs as to count II.

The trial court gave the following jury instruction, which was patterned on IPI Civil 3d No. 200.03:

"To establish undue influence as a ground of invalidity, the plaintiff must prove each of the following propositions with respect to the claim that Blanche Hillard was under the undue influence of Zollie Arbogast:

1. That there was an attorney-client relationship between Daniel Arbogast and Blanche Hillard whereby Daniel Arbogast exercised dominance over Blanche Hillard and Blanche Hillard was dependent upon Daniel Arbogast;

2. That Blanche Hillard reposed trust and confidence in Daniel Arbogast;

3. That Daniel Arbogast prepared the document purporting to be the Last Will of Blanche Hillard; and

4. That Daniel Arbogast received a substantial benefit under the terms of the document, when compared to the other persons who have an equal claim to Blanche Hillard's bounty.

If you find that each of these propositions has been proved, then your verdict should be that the document is not the valid Last Will of Blanche Hillard.

If you find that any of these propositions has not been proved, then your verdict should be that the document is the valid Last Will of Blanche Hillard unless the plaintiff has proved one of the other alleged grounds of invalidity."

■ Plaintiffs tendered a similar instruction, which referenced only the Arbogast firm and stated that Daniel received a substantial benefit under decedent's will. The trial court rejected this instruction. We conclude that a proper instruction would include Zollie, Daniel, and the firm. It appears the trial court rejected plaintiffs' tendered instruction because Daniel, not Zollie or the firm, was the beneficiary under decedent's will, and it is clear that he had no role in preparing the will. However, since we have held that Zollie and the firm could have received a benefit by the bequest to Daniel, such an instruction should have been given.

The material in the following sections is not to be published pursuant to Supreme Court Rule 23. 166 Ill. 2d R. 23.

For the reasons stated, the judgment on the verdict is affirmed as to counts I and III and reversed as to count II. The cause is remanded for a new trial as to count II.

Affirmed in part; reversed in part and remanded.

COOK, P.J., and GREEN, J., concur.