FERN ESLICK et al., Plaintiffs-Appellants, v. MAXINE MONTGOMERY et al., Defendants-Appellees.

(No. 71-130; )

Second District—February 3, 1972.

Simon Stickgold, of Woodstock, for appellants.

McCauley, Weir & Lanum, of Harvard, for appellees.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

The plaintiffs, adult children of Dolly Montgomery, now deceased, sued to set aside their mother's conveyance, in her 81st year, of her farm to herself and defendant, her other surviving adult child in joint tenancy. (Lois Lichty is named a defendant solely as the intermediate nominee in the conveyance.) The trial court, in a bench trial, found that the plaintiffs had not sustained the burden of proving that Dolly Montgomery was either incompetent at the time she signed the conveyance to the nominee, or under the undue influence or duress of the defendant. The court entered judgment for the defendant, George Montgomery,[1] from which the plaintiffs appeal.

We have concluded that the judgment below is fully supported by the record. We have been aided by an unusually detailed memorandum opinion in which the trial judge cogently summarized the testimony and carefully stated his observations as to weight and credibility.

Dolly Montgomery, during the six month period preceding her death, appeared thin and frail. For many years, she had been suffering from poor eyesight and poor hearing. She suffered from diabetes and heardening of the arteries. She used a cane to walk on most occasions. Her mind would also wander on occasions.

Despite her infirmities, Dolly Montgomery was an active person who got around quite well. She and George lived alone on the farm for approximately four years before her death. George regularly drove her to town in the old family car. In town, Dolly would purchase sundry items including prescription drugs for her use and greeting cards for her children. She recognized and conversed regularly with family members and individuals with whom she did business. She appeared to comprehend her situation and position in life with no evidence of a real lack of orientation. The evidence shows that at all times, she seemed to know who she was, who her children were, and who she did business with as well as the nature of this business. The business was of a limited nature, consisting mostly of everyday tasks.

Dolly visited her physician, Dr. John Hill, at least monthly. The doctor

---

[1] The complaint named "Maxine Montgomery, a/k/a George Montgomery" as defendant. Plaintiffs' counsel and various of the witnesses have used the name "Maxine" and the feminine pronoun in referring to the defendant; while defendant's counsel and other witnesses have used "George", and the masculine pronoun. For convenience, we adopt defendant's usage.

allowed her to buy her own prescriptions and to administer them according to his directions. Dr. Hill, as plaintiff's witness, testified that he had referred to Dolly as a "fiesty old gal" with a lot of spirit.

Dolly enjoyed harmonious relations with all of her children, although she appeared to be closer to George. Her other children visited her with varying regularity, from weekly visits to semi-annual or annual visits. Most of the plaintiffs resided at a distance from Hartland Township. The children made very nominal contributions of food and money during the course of these visits.

Testimony of George's siblings was to the effect that George was born a female christened "Maxine", and was considered a female by them. Further testimony indicated Dolly referred to "George" as "Maxine" when he was not present, but otherwise called him "George" in his presence; referred to him as "son", and treated him as a man. George testified he was always known as "George".

The evidence, most of which was testimony by interested parties, shows that there was little, if any, detailed discussion by the decedent with anyone regarding the disposition of her property at death. There was testimony to the effect that Dolly intended to leave her property to George because he cared for her, and contradictory testimony to the effect that when Dolly died, her property would go equally to all of her children.

Around March 1, 1968, George visited the offices of the law firm of Hamer & Schuh in Woodstock, Illinois. George asked to see Mr. Hamer who was on vacation and was referred to Attorney Schuh. Dolly was acquainted with attorney Hamer, since he had previously performed some legal services for her. George talked with Schuh about Dolly's wishes. Schuh explained briefly the preparation of the deeds and a will for Dolly. At this initial meeting, there was no mention of Dolly's other children. Attorney Schuh then told George to talk with Dolly and see if the planned arrangements were satisfactory to her. George returned two or three days later to the office and told Schuh the arrangements were acceptable to his mother.

On March 6, 1968, George and Dolly went to Schuh's office. Schuh took Dolly into his private office to explain the purport of the deeds and will to her while George remained in the outer office. Schuh testified he explained to Dolly the nature of the deed to Lois Lichty and the deed from Lois Lichty to George and herself in joint tenancy before she signed. He did not have her read the deeds. Schuh testified further that George's name came up only once.

"I said, 'Now, this is going to be in your name and George's name, so

that, if something happens to you, it will automatically be his; no estate.' She said, 'That's the way it should be; he has been working the farm and taking care of me.'"

Dolly then signed the deed at the place indicated by Schuh. Schuh then went on to discuss Dolly's will with her, which disposed of her personal property.

Schuh testified that the decedent appeared to understand what he said, was not confused, knew who she was and where she was. He also testified that in his opinion the decedent had the mental capacity to know who her children were and to choose between them, to conduct ordinary business affairs and to sign a deed and a will.

Appellants first argue that the infirmities of the decedent, particularly her deafness, blindness, forgetfulness, and rapidly failing health, rendered her incompetent to understand the nature and consequences of the instrument she executed.

■■■ The presumption is that the grantor of a deed was of sound mind when he executed it, and the burden of showing that he was mentally incompetent is on the party seeking to set aside the transaction. (*Greathouse v. Vosburgh* (1960), 19 Ill.2d 555, 568; *Johnson v. Lane* (1938), 369 Ill. 135, 150; *White v. White* (1960), 28 Ill.App.2d 19, 27.) Persons of a mature age are presumed to be mentally competent. Incompetency cannot be inferred merely from old age or physical illness. (*Staude v. Heinlein* (1953), 414 Ill. 11, 20.) This presumption is true even in combination of age and infirmity with a defective memory. *Dalbey v. Hayes* (1915), 267 Ill. 521, 527.

■■■ The test of mental capacity to make a conveyance was stated by the court in *Kolze v. Fordtran* (1952), 412 Ill. 461, 469 to be that "one must have sufficient mind and memory to comprehend the nature and effect of the act in which he is engaged. Impairment of mind incident to old age and disease or eccentricities will not render the conveyance invalid so long as the grantor is able to comprehend the nature of the transaction and protect his own interests." See also *Redmon v. Borah* (1943), 382 Ill. 610, 621.

■■ The trial court correctly held that Dolly Montgomery had sufficient mental capacity to understand the nature and effect of the deed she signed on March 6, 1968, and to protect her own interests. There was no testimony at trial that Dolly Montgomery was mentally impaired, but only that she suffered from numerous physical problems quite commonly found in those of advanced years and that her mind wandered on occasion. Appellants contend because of Dolly's poor eyesight and poor hearing, she could not have seen, heard, or understood any of the

explanations. We disagree. Attorney Schuh testified he sat next to Dolly and explained the transactions and deeds to her. Dolly's reply to Schuh's statement that the farm would go to George if she died, "That's the way it should be", is a further indication of her awareness of the import of her actions. There is no contention that Dolly could or did read the deeds in question. However, Dr. Hill testified that while Dolly would not be able to understand a lengthy document if read to her, she could understand the gist of a document if explained to her carefully.

■■ Appellants further argue, relying on the case of *Lewis v. Deamude* (1941), 376 Ill. 219, 221, that defendant's non-expert witnesses should not have been allowed to testify as to their opinion of the decedent's competency because of a failure on their part to testify to sufficient facts and circumstances to indicate that their opinions were not guesses, speculation, or suspicion.

The testimony was properly admitted. Defendant's witnesses, Olga Drexel and Mary Brown, had sufficient opportunity to observe the decedent. Both witnesses worked in the drug store where Dolly had shopped over a period of years.

Appellants next contend that the ambivalent sexual identity of the defendant, George Montgomery, in which the decedent acquiesced, established proof of the long continued control by the defendant over the mind and thought processes of the decedent amounting to undue influence.

■■■ Undue influence such as will vitiate a deed means wrongful influence operating at the time the deed was signed with such force as to deprive the grantor of free agency. (*Ropacki v. Ropacki* (1930), 341 Ill. 301, 307.) Where a parent is the grantor and the child is the grantee, there is no presumption of undue influence merely because of the family relationship. *Stewart v. Sunagel* (1946), 394 Ill. 209, 215.

■■ The fact that the decedent, who lived with and depended on George for daily assistance, chose to treat George as a male, thus preventing acrimony in the household and not forcing a confrontation with her child, is not evidence that the decedent participated in the world of unreality out of fear or coercion such as would vitiate free will.

■■ Appellants' final argument is a transparent attempt to raise the issue of a fiduciary relationship on the grounds that a Court of Equity will look at the substance of a transaction to ascertain the real interest of a party. Appellants did not allege a fiduciary relationship in the complaint and appellants' counsel stipulated at trial that there was no claim of a fiduciary relationship between Dolly Montgomery and grantees George Montgomery and Lois Lichty. We do not consider this issue on

appeal. The stipulation is binding upon the appellants. *People v. Spring Lake Dist.* (1912), 253 Ill. 479, 492.

The judgment below is affirmed.

Judgment affirmed.

MORAN, P. J., and ABRAHAMSON, J., concur.