THIRD DIVISION
 March 19, 1997

No. 1-94-3018

IN RE THE ESTATE OF 
WILLIAM ROESELER, Deceased. )
________________________________ )
 )
MARY ANDERSON, )
 )
 Petitioner-Appellant, ) Appeal from the Circuit
 ) Court of Cook County. 
 v. )
 ) 
BARBARA KUBITZ, As Executor Of The )
ESTATE OF WILLIAM ROESELER, ) Honorable
Deceased, BERNICE CHADWICK, MAXINE ) Arthur Perivolidis,
CHRISTOPHER and BARBARA KUBITZ, ) Judge Presiding.
Legatees Under The Last Will and )
Testament Of WILLIAM ROESELER, )
WALTER CHRISTOPHER, SCOTT )
CHRISTOPHER and UNKNOWN HEIRS, )
 )
 Respondent-Appellee. )

 JUSTICE JOSEPH GORDON delivered the opinion of the court:

 The decedent, William Roeseler, died on August 4, 1990, and his last
will and testament, executed on May 23, 1990, was admitted to probate on
August 31, 1990. Thereafter, the petitioner, Mary Anderson, the decedent's
step-daughter, filed two pleadings regarding that will against respondents
Scott, Walter, and Maxine Christopher; Barbara Kubitz; and Bernice Chadwick. 
The first pleading was a two-count petition to contest the will, alleging at
count one that the decedent's physical and mental condition had deteriorated
significantly by the time he executed his will and that he therefore lacked
testamentary capacity, and at count two that the decedent had become dependent
upon respondents for his basic needs and that they exerted undue influence
upon him in order to cause him to name them as beneficiaries in his will. The
second pleading filed by petitioner in this action was an independent but
related complaint against respondents seeking compensatory and punitive
damages for their alleged intentional interference with petitioner's economic
expectancy under the decedent's will.
 Respondents filed a motion for summary judgment as to plaintiffs' will
contest petition, which the trial court granted. Petitioner then filed a
motion to reconsider that order which the trial court denied. Thereafter,
respondents filed a motion to dismiss petitioner's intentional interference
complaint, on the grounds that the wrongful conduct alleged therein was
identical to the conduct alleged in plaintiff's will contest action which had
been defeated on summary judgment. The trial court granted that motion to
dismiss, and petitioner now appeals from those orders.
 The undisputed facts are as follows. The petitioner was the only child
of Fern Roeseler and Fern's first husband who died in 1967. The decedent
became the step-father of the petitioner by virtue of his marriage to Fern in
1968. Fern and the decedent lived in Chicago, and the petitioner lived in
California, where she had moved with her husband in 1955. The petitioner
visited the Roeselers in Chicago annually, until 1983 when she suffered a
stroke and could no longer make the trip. Shortly after their marriage, in
1968 Fern and the decedent executed reciprocal wills leaving everything to
each other except that the petitioner would inherit upon the death of the last
remaining spouse. Fern died in 1983, and in 1984, the decedent executed a
will leaving everything to the petitioner and to the petitioner's daughter,
Jean Anderson. The 1968 and 1984 wills were drafted by the Roeselers'
attorney and neighbor, Walter Christopher. On July 25, 1989, the decedent
executed a new will prepared by Walter's son, Scott Christopher, who became
the attorney for the decedent after Walter suffered a stroke. That will
designated as beneficiaries decedent's neighbors, respondents Maxine
Christopher, who was the mother of Scott and the wife of Walter; Barbara
Kubitz; and Bernice Chadwick. It did not leave anything to the petitioner. 
Barbara Kubitz had previously been given written power of attorney by the
decedent in 1988 pursuant to an instrument drafted by Scott Christopher.
 It is further undisputed that in 1990, Scott Christopher contacted Kurt
Heerwagen, a partner in the law firm of Boeger, Heerwagen, Lusthoff and
Brendemuhl to request that Heerwagen redraft the decedent's July 1989 will. 
Scott Christopher then sent to Heerwagen a copy of the decedent's 1989 will
and a letter containing instructions outlining the new will. Scott later
disposed of his file copy of that letter and no copy thereof was ever produced
in court. Kurt Heerwagen prepared a will which the decedent signed on May 23,
1990. The terms of the 1990 will were identical to those of the July 25,
1989, will prepared by Scott Christopher, except that the new will expressly
provided that if Maxine Christopher predeceased the decedent, then her
descendants, including Scott Christopher, would inherit from the decedent in
her stead.
 In support of their motion for summary judgment, respondents relied upon
the deposition testimony of the petitioner, Mary Anderson; Craig Lusthoff, a
partner of Heerwagen and a witness to the signing of the decedent's will;
Maxine Christopher; Barbara Kubitz; Bernice Chadwick. Both respondents and
petitioner relied upon the deposition testimony of Kurt Heerwagen; Scott
Christopher; and Blanche Wardell, the decedent's sister-in-law. In addition,
the petitioner submitted certain Oak Park Hospital records relating to the
decedent's health.
 In the excerpts of the deposition testimony of the petitioner, Mary
Anderson, submitted by the respondents in support of their summary judgment
motion, petitioner testified that she had moved with her husband to California
in 1955 because he had obtained a job there, and that her natural parents
lived in Chicago at all times while she lived in California. Petitioner
testified that she came to Chicago for her natural father's funeral in 1967,
but that when her mother had a mild stroke shortly thereafter, she did not
come to Chicago to visit her in the hospital, alleging that her mother did not
wish her to do so. She also stated that after her mother was cremated, she
did not inquire as to the disposition of the ashes and had no idea as to what
had happened to them. Petitioner also said that her belief that there was
undue influence exerted upon the decedent was based on the fact that he
changed his will in 1989. Petitioner further stated that the reason she
believed that Bernice Chadwick and Barbara Kubitz took advantage of their
relationship with her step-father was that they were named in his will at a
time when he depended upon them for his basic needs.
 Craig Lusthoff testified in his deposition that he was a law partner of
attorney Heerwagen and that he was a witness at the signing of the decedent's
May 1990 will. According to Lusthoff, the decedent lived in an "interesting
older home" that "was nicely done." Lusthoff also testified that during
conversations with the decedent, he observed that the decedent spoke "plainly
and clearly."
 Maxine Christopher testified in her deposition that her husband, Walter,
suffered a stroke in January 1987 and as a result lost his ability to
communicate clearly and never thereafter returned to the practice of law. 
Maxine also stated that she had never assisted in her husband's or in her son
Scott's law practices. Maxine testified that she did not know that she was a
beneficiary under the decedent's May 1990 will until approximately three days
prior to his death.
 Barbara Kubitz testified in her deposition that she had no knowledge of
the contents of the decedent's will until after his death, and that she was
not aware until that time that she was the executor thereunder or of the
extent of his estate. Further, Kubitz had neither met nor heard of the
attorney who drafted the decedent's May 1990 will, Kurt Heerwagen. Kubitz
also stated that she visited the decedent on most holidays and every Sunday,
and that she took the decedent grocery shopping, to the doctor and to pick up
his prescriptions after he lost his driver's license. Kubitz further stated
that she had been given power of attorney over the legal and financial affairs
of the decedent in 1988.
 Bernice Chadwick testified at her deposition that she was the decedent's
next door neighbor, that she did not know about his will until after his
death, and that she did not know the attorney who drafted that will. Chadwick
did not have a social relationship with the Christophers, had little
association with them, and did not know of Walter Christopher's 1987 stroke
until some time in 1991.
 As noted, both parties relied upon excerpts of the deposition testimony
of Scott Christopher, Kurt Heerwagen, and Blanche Wardell. Each submitted
their own excerpts from these depositions. The deposition testimony of Scott
Christopher to which respondents referred revealed that Scott had prepared a
will for the decedent in 1989, but that he never possessed a copy of the May
1990 will, nor did he ever have any knowledge as to its preparation or
contents until after the death of the decedent. In that regard, Scott stated
that when Barbara Kubitz inquired about the will, he told her to talk to
Heerwagen because he knew nothing about it. While serving the decedent as his
attorney, Scott also prepared the decedent's tax returns. He said that in so
doing he had merely acted as a tax preparer, and had referred any complicated
tax analysis to an accountant.
 In the portions of the deposition testimony of Scott Christopher to
which petitioner referred, Scott stated that he had practiced law as a partner
of Walter Christopher, his father, until 1987, when Walter had a stroke, after
which Scott represented the decedent. Scott testified that he advised the
decedent that he felt "uncomfortable" drafting the decedent's 1989 will
because the decedent wanted to name Scott's mother, Maxine, as a beneficiary
therein. Scott nevertheless drafted that will. Scott advised the decedent
that another attorney would be needed to draft a subsequent will, in which he
(Scott) would be named to inherit in Maxine's stead if she were to predecease
the decedent. While discussing with the decedent who should draft a new will,
the decedent commented to Scott that the petitioner would probably wish to
contest such a will because she would not be left anything therein. Scott
then contacted Kurt Heerwagen regarding the preparation of the new will. 
Heerwagen's partner, Craig Lusthoff, had gone to high school with Scott and
was also Scott's college fraternity brother. Heerwagen had also gone to the
same college, and Scott had previously referred other business to Heerwagen's
law firm in the past.
 According to Scott, he sent to Heerwagen a copy of the July 25, 1989,
will which he had prepared for the decedent, enclosing a cover letter which
outlined what the decedent wished the terms of the new will to be. Scott
recalled that he had two telephone conversations with Heerwagen after sending
that correspondence. In the first of those conversations, Heerwagen advised
Scott to destroy his copy of the aforementioned cover letter which Scott had
sent to Heerwagen because it might impact any subsequent will contest, but
Scott refused to do so. In the second conversation, Heerwagen informed Scott
that the May 23, 1990, will had been executed. Scott further testified that
he had since discarded the letter in question, not because Heerwagen advised
him to do so, but because he was not the attorney who had drafted the May 1990
will and had no corresponding file in which to place the letter.
 In the excerpts of the deposition testimony of Kurt Heerwagen to which
respondents referred in their motion, Heerwagen stated that the only contact
Scott Christopher had had with him regarding the decedent's May 1990 will was
to refer the matter to him for further consultation with the decedent. 
Heerwagen subsequently received a telephone call from the decedent directly. 
During that conversation, the decedent informed him that he did not want "the
state" to get his property. He then advised Heerwagen as to the size of his
estate and also as to the manner in which he wanted his property to be
distributed. Heerwagen concluded that the decedent seemed to be "fairly
certain" of what he wanted to do with his will.
 According to Heerwagen, following his conversation with the decedent, he
independently prepared the will, without the participation of Scott
Christopher, and then mailed a copy thereof to the decedent only on April 10,
1990. Thereafter, Heerwagen had a second telephone conversation with the
decedent, during which the decedent approved of the draft of the will and
scheduled a time for its signing. The signing took place one month later, on
May 25, 1990, at the home of the decedent. According to Heerwagen, none of
the respondents were present at the signing of the May 1990 will, nor did they
have any knowledge that it had been prepared or scheduled for signing. 
Heerwagen also stated that at the signing, the decedent was alert and
responsive and was clear as to his intentions regarding the disposition of his
property. Heerwagen stated that he never met or discussed the will with any
of the respondents prior to the death of the decedent. The original will was
kept at all times at Heerwagen's office pursuant to decedent's instructions,
and was filed by Heerwagen, who had originally appeared before the probate
court as the attorney for the estate of the decedent.
 The portion of the Heerwagen deposition testimony to which petitioner
referred in her response reflects that Heerwagen did not know that the
decedent had been married, much less that he had a step-daughter from his
marriage, when he drafted the May 1990 will. Heerwagen testified that he
therefore did not know anything about the relationship between the decedent
and the petitioner at the time he drafted that will. Heerwagen further stated
that he spent only 15 minutes with the decedent when the will was signed.
 The portions of the deposition testimony of Blanche Wardell upon which
respondents relied reflected that she had lived in Florida since 1962, and
that she was the decedent's sister-in-law, having married Fern Roeseler's
brother. Wardell testified that she had been close to the decedent for 27
years, and that she had had social contact with him and his wife on numerous
occasions. Wardell characterized the decedent as being a very private person
who considered himself to be self-reliant and who did not want anybody
interfering with him in any way. She also testified that in the five years
before his death, the decedent never had anyone stay with him to take care of
him, such as a nurse or a housekeeper. The decedent cooked his own food,
largely consisting of T.V. dinners and cans of stew. Wardell said that as far
as she knew, he was in control of his bladder, and that his only physical
problem which made him dependent upon others was his failing eyesight. 
Wardell said that the decedent lived in financial comfort, and that he was
still doing his own banking in 1987. Wardell pointed out that she was in
Europe when he signed the 1990 will, and that she had last seen the decedent
more than three years prior to the signing of that will. Wardell additionally
stated that she had "absolutely no idea" about any specific instances in which
respondents did anything actively to gain control or dominance over the
decedent. Wardell also testified that she did not have any facts to support
her feeling that the decedent did not have the ability to know the nature and
extent of his property when he signed his July 25, 1989 will. Wardell further
stated that she had no facts to show that the decedent did not know to whom he
wanted to leave his property in 1989, and that she did not know whether he
knew he was in fact signing a will at that time.
 In the portions of Wardell's deposition testimony upon which the
petitioner relied, Wardell testified that the decedent repeatedly told her
throughout the years that he was glad to have the petitioner as family and
that he was happy in that regard to have family to whom he could leave his
money. Wardell further stated that the decedent and the petitioner were
friends who laughed and joked together, that the decedent told her that the
petitioner called him "dad," and that the decedent adored the petitioner's
daughter. After the death of the decedent's wife in 1983, Wardell visited the
decedent several times, and otherwise communicated with him by letter or
telephone at least twice each month, including several conversations with him
shortly before his death. Wardell first noticed that the decedent had begun
to fail mentally and physically during her stay at his home in 1985. She
noticed at that time that his mind wavered, that he had "failed tremendously
from the man I had known a long time ago," that he was not able to care for
himself, and that he needed somebody to stay with him. Wardell further
testified that she stayed with Roeseler again for a period of three weeks in
1987. During that visit, she noticed that Roeseler, who had once been a very
"dapper" man, was wearing filthy clothes. She also stated that he and his
house were filthy, and that his "sweaters were dirty *** the sleeves were
literally black *** the sheets on his bed *** were indescribable *** [and
that] he wore underwear which was absolutely brown, real brown." According to
Wardell, by 1987, the decedent "was no longer up to par[,] *** had begun to
decline in his ability to prioritize values[,] *** [and] didn't know what was
important to him and what was not."
 The petitioner also referred to Wardell's testimony that between 1988
and his death, the decedent had become a very proud old man who was trying to
retain his dignity. She testified that he had reached the point where he
repeated himself constantly, stubbornly insisted on staying in his house and
resisted the attempts of people trying to help him. Wardell also stated that
by May 1990, the decedent had become more enfeebled, was not in full control
of his own thinking or capable of sorting out ideas in his head or of making
any sound judgment. She testified
 "I have facts that he had become extremely senile, very slow in
 speech *** [and] his reactions were very slow. *** he was not
 mentally alert *** was filthy *** [and] was not eating regularly."
According to Wardell, the decedent was almost blind and suffered from other
various physical ailments, had difficulty writing checks and signing his name,
and was not able to adequately care for himself or make rational decisions. 
She testified that at that time, the decedent merely rambled in conversation
and was "very mentally slowed down." Wardell had several conversations with
the decedent in and around May 1990 in which she observed that the tone of
voice and manner of speaking of the decedent were slow and enfeebled. Wardell
also received a letter from the decedent in June 1990 in barely legible
handwriting. She stated that the letter was not lucid, although she did not
fully recall its contents. Wardell concluded that by May 23, 1990, the
decedent was "senile and not competent," and that he "definitely was not"
capable of making a will.
 Finally, the petitioner referred to Wardell's deposition wherein she
testified that, notwithstanding that she, the petitioner Mary Anderson and
Mary Anderson's daughter were the decedent's only living family, respondents
failed to inform them that the petitioner had been taken to the hospital
immediately before his death, and failed to inform them that he had died until
a week afterwards. According to Wardell, this was further proof of the
fraudulent intentions of the respondents.
 In addition, the petitioner submitted to records from Oak Park Hospital
which reflect that at the time of his death, Roeseler suffered from cataracts,
hearing loss, emphysema, high blood pressure and fluid retention.
 The trial court granted respondents' motion for summary judgment on both
counts of the will contest petition, including count one, alleging a lack of
testamentary capacity and count two, alleging undue influence. Petitioner
filed a motion to reconsider that order. In support of that motion,
petitioner submitted the affidavit of Dr. Sanford Finkel, a licensed
psychiatrist in Illinois. In his affidavit, Finkel averred that decedent had
become increasingly weak and susceptible to undue influence in his affairs;
that he desired to continue living at home and was misled by respondents into
believing that the petitioner wished to remove him from his home; and that
respondents substituted their judgment for that of the decedent in the
drafting of his May 1990 will.
 The trial court denied petitioner's motion to reconsider. Respondents
thereupon filed a section 2-619 motion to dismiss (735 ILCS 5/2-619 (West
1994)) petitioner's amended complaint for intentional interference with
petitioner's economic expectancy to inherit from the decedent. In their
motion, respondents urged that because the trial court had entered summary
judgment against the petitioner on her will contest petition, the petitioner
could not prevail on her intentional interference claim because it was based
on identical allegations of tortious conduct. The trial court granted the
respondents' motion to dismiss. The petitioner appealed from both the summary
judgment order and from the order dismissing the intentional interference
complaint.
DISCUSSION:
 On appeal, the petitioner contends that the trial court erred in
granting respondents' motion for summary judgment. She urges that there are
genuine issues of material fact as to whether the decedent had adequate
testamentary capacity to create his May 1990 will, and as to whether
respondents exercised undue influence over the decedent in connection with the
signing of that will. Petitioner further contends that since the trial court
erred in granting summary judgment as to her will contest petition, it also
erred in dismissing her tortious interference with economic expectancy
complaint. For the reasons discussed more fully below, we reverse both the
grant of summary judgment on the will contest petition and the dismissal of
the intentional interference tort action.
 It is well-established that a motion for summary judgment may properly
be granted when "the pleadings, depositions and admissions on file, together
with the affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment as a matter
of law." 735 ILCS 5/2-1005 (West 1994); e.g., Torres v. City of Chicago, 261
Ill. App. 3d 499, 632 N.E.2d 54 (1994). In ruling on a motion for summary
judgment, the trial court must construe the pleadings, depositions and
affidavits in the light most favorable to the nonmoving party. E.g., First
State Insurance Co. v. Montgomery Ward & Co., 267 Ill. App. 3d 851, 642 N.E.2d
715 (1994); Stephen v. Swiatkowski, 263 Ill. App. 3d 694, 635 N.E.2d 997
(1994). Moreover, if fair-minded persons could draw different inferences from
the undisputed facts, summary judgment should not be granted. See Outboard
Marine Corp. v. Liberty Mutual Insurance Co., 154 Ill. 2d 90, 607 N.E.2d 1204
(1992); Anglin v. Oros, 257 Ill. App. 3d 213, 628 N.E.2d 873 (1993). 
Appellate review of an order granting summary judgment is de novo. E.g.,
Hesselink v. R.L. Perlow Corp., 265 Ill. App. 3d 473, 637 N.E.2d 575 (1994);
La Salle National Bank v. Skidmore, Owings & Merrill, 262 Ill. App. 3d 899,
635 N.E.2d 564 (1994); Myers v. Health Specialists, S.C., 225 Ill. App. 3d 68,
587 N.E.2d 494 (1992).
 We first address petitioner's contention that an issue of fact exists as
to whether the decedent lacked testamentary capacity to create the May 1990
will. To set aside a will on the grounds of lack of testamentary capacity,
the petitioner must demonstrate that at the time the will was executed the
testator lacked sufficient mental ability to know he was making a will, to
know and remember the natural objects of his bounty, to comprehend the
character and extent of his property and to make disposition of his property
according to a plan formed in his own mind. Butler v. O'Brien, 8 Ill. 2d 203,
133 N.E.2d 274 (1956); In re Estate of Ciesiolkiewicz, 243 Ill. App. 3d 506,
611 N.E.2d 1278 (1993); In re Estate of Dossett, 159 Ill. App. 3d 466, 512
N.E.2d 807 (1987). Any legatee under a prior will has standing to contest the
validity of a will if her contest is initiated within the prescribed statutory
period and she stands to inherit if the contested will is set aside. See
generally 755 ILCS 5/8-1 (West 1994); In re Estate of Keener, 167 Ill. App. 3d
270, 521 N.E.2d 232 (1988). The natural objects of a testator's bounty
include those people related to him by ties of blood or affection, i.e., those
who are or should be considered to be the recipients of his bequests. See,
e.g., 79 Am. Jur. 2d Wills 71, at 330 (1975); Cunningham v. Stender, 127
Colo. 293, 255 P.2d 977 (1953). It is well recognized that evidence of the
mental condition of the testator within a reasonable time before or after the
making of a will is relevant to show his mental condition at the time of the
execution of the will. Voodry v. Trustees of University of Illinois, 251 Ill.
48, 95 N.E. 1034 (1911) (evidence of the mental condition of the testator two
years prior to the execution of the will relevant to show lack of testamentary
capacity at time of execution); Ciesiolkiewicz, 243 Ill. App. 3d 506, 611
N.E.2d 1278; Dossett, 159 Ill. App. 3d 466, 512 N.E.2d 807. The testator is
presumed sane, and the burden of proof is on the will contestant to rebut that
presumption. Ciesiolkiewicz, 243 Ill. App. 3d 506, 611 N.E.2d 1278.
 In the instant case, the record can support a reasonable inference that
William Roeseler lacked testamentary capacity at the time of the signing of
the May 1990 will. In that regard, according to Blanche Wardell, the
decedent's mental and physical condition began to deteriorate in as early as
1985. Wardell testified that she visited the decedent in 1985 and in 1987,
and that she kept in touch with the decedent after 1987 by mail and by
telephone, stating in particular that she had had several telephone
conversations with the decedent in and around May and June 1990 and that she
had received a letter from him at around that time. On the basis of her
contact with the decedent, Wardell stated that the decedent, who had formerly
kept himself clean and was mentally alert, began to live in filth and squalor
and became unable to discern what was important to him or to prioritize his
values. Wardell concluded from her first-hand observations that the decedent
had become senile and incompetent, was incapable of making any sound judgment,
merely rambled and repeated himself in conversation, was not in full control
of his own thinking, and was otherwise physically dependent on respondents for
his basic needs.
 The record also supports an inference that the decedent was not aware of
the natural objects of his bounty, insofar as for a period of twenty years,
the petitioner, his step-daughter, had been either the sole alternative
beneficiary under the will of the decedent (when his wife was alive) or the
primary beneficiary (after his wife's death). Furthermore, according to
Wardell's testimony, the decedent considered the petitioner to be his family
and was happy in that regard to have her as a devisee under his will. Wardell
further stated that the decedent and the petitioner were friends who laughed
and joked together, that according to the decedent the petitioner called him
"dad," and that the decedent adored the petitioner's daughter. See 79 Am.
Jur. 2d Wills 71 (natural objects of bounty include those people related to
testator by ties of blood or affection, i.e., those who are or should be
considered to be the recipients of his bequests); Cunningham, 127 Colo. 293,
255 P.2d 977. See also Ciesiolkiewicz, 243 Ill. App. 3d 506, 611 N.E.2d 1278
(summary judgment particularly inappropriate where the inferences sought to be
drawn deal with questions of motive, intent or subjective feelings and
reactions). The record also reflects that the decedent never even mentioned
to attorney Heerwagen, who drafted the 1990 will, that he had a stepdaughter
or that he had ever been married. These facts are sufficient to generate a
reasonable inference that the decedent lacked sufficient mental ability to
know and remember the natural objects of his bounty. The testimony of Wardell
concerning the decedent's degeneration, her opinion as to his senility and
incompetence, and her testimony regarding the natural objects of his bounty
are sufficient to create an issue of fact as to the decedent's testamentary
capacity during the period in question. Ciesiolkiewicz, 243 Ill. App. 3d 506,
611 N.E.2d 1278 (lack of testamentary capacity exists where testator lacks
sufficient mental ability to know he is making a will, to know the natural
objects of his bounty, to comprehend the character and extent of his property
and to make disposition of his property according to a plan formed in his own
mind); Dossett, 159 Ill. App. 3d 466, 512 N.E.2d 807.
 Respondents contend that the petitioner cannot rely on the deposition
testimony of Blanche Wardell to establish the existence of an issue of fact as
to the decedent's testamentary capacity because, according to respondents,
Wardell did not provide a sufficient factual basis for her testimony that the
decedent lacked testamentary capacity during the period in question. We
disagree. A lay witness may give her opinion regarding the unsoundness of a
testator's mind (Powell v. Weld, 410 Ill. 198, 101 N.E.2d 581 (1951)), so long
as that witness had a sufficient opportunity in a conversation or some other
transaction in which to form that opinion. Butler v. O'Brien, 8 Ill. 2d 203,
133 N.E.2d 274 (1956) (lay witness may testify to decedent's lack of
testamentary capacity if testimony demonstrates sufficient opportunity to
observe the condition of the decedent); Eslick v. Montgomery, 3 Ill. App. 3d
447, 278 N.E.2d 412 (1972) (non-expert witness may testify as to decedent's
competency if testimony reveals that they had sufficient opportunity to
observe decedent).
 Here, there is no question that Wardell had sufficient opportunity to
make these observations as to the decedent's lack of testamentary capacity to
execute his May 1990 will. Wardell specifically enumerated the bases for that
opinion wherein she testified that she visited the decedent at his home in
Chicago on various occasions prior to 1987 and that subsequently, she
repeatedly spoke with him by telephone and corresponded with him by letter. 
These communications are sufficient to render the lay opinion of Wardell
admissible, and once admissible, its weight is not properly resolved on
summary judgment. See Butler, 8 Ill. 2d 203, 133 N.E.2d 274 (lay testimony
regarding testamentary capacity admissible where witness testified to numerous
conversations with decedent and to having known and communicated with decedent
over period of many years); Lewis v. Deamude, 376 Ill. 219, 33 N.E.2d 440
(1941) (lay testimony regarding testamentary capacity admissible where witness
testified that certain conversations formed basis of opinion). See also
Ciesiolkiewicz, 243 Ill. App. 3d 506, 611 N.E.2d 1278 (trial court may not
weigh evidence on summary judgment).
 Respondents also urge that Wardell contradicted herself in her
deposition testimony, and that therefore, her testimony cannot be used to
establish the existence of an issue of fact as to the decedent's testamentary
capacity. In support, respondents contrast Wardell's statements that the
decedent lacked testamentary capacity "solely [because the petitioner] was
totally omitted from the will," with her detailed testimony regarding his lack
of testamentary capacity. Respondents argue that these statements contradict
each other and that therefore, Wardell's detailed reasons supporting her
belief that the decedent lacked testamentary capacity cannot be used to
generate an issue of fact on that issue. We disagree.
 While the foregoing quoted excerpt of testimony, when viewed in
isolation, appears to exclude other supportive facts, Wardell's deposition as
a whole provides numerous additional facts and observations upon which her
opinion can be predicated. When viewed in the context of her entire
deposition, it is clear that Wardell never abandoned her carefully supported
belief that Roeseler lacked testamentary capacity. See In re Estate of
Sewart, 236 Ill. App. 3d 1, 602 N.E.2d 1277 (1991) (court need not disregard
statements in deposition testimony favoring nonmovant despite isolated
contradictory statement if overall context of testimony shows no abandonment
of position favoring nonmovant); In re Estate of Mallas, 100 Ill. App. 2d 88,
241 N.E.2d 482 (1968).
 Respondents urge that the decisions of Tidholm v. Tidholm, 391 Ill. 19,
62 N.E.2d 473 (1945), and Anthony v. Anthony, 20 Ill. 2d 584, 170 N.E.2d 603
(1960), justify the entry of summary judgment here on the issue of
testamentary capacity. However, those cases are fully distinguishable. 
Unlike here, where the trial court on summary judgment was precluded from
weighing evidence, Anthony involved a trial at the conclusion of which the
trial court was not precluded from weighing the evidence. Furthermore,
although Tidholm involved the granting of a motion for a directed verdict, it
is nevertheless factually distinguishable even if the directed verdict
standard applied there were also applied to rulings on summary judgment
motions. See generally Fooden v. Board of Governors, 48 Ill. 2d 580, 587, 272
N.E.2d 497, 500 (1971) (permitting the Pedrick v. Peoria & Eastern R.R. Co.,
37 Ill.2d 494, 229 N.E.2d 504 (1967) standard to be applied in the granting of
a summary judgment motion); Winnetka Bank v. Mandas, 202 Ill. App. 3d 373, 559
N.E.2d 961 (1990) and citations therein). In Tidholm, the court held that
there was uncontradicted evidence that the decedent transacted his own
business during the period in question without any assistance, and no witness
had testified that the decedent's mental problems related in any way to his
ability to make a will. In contrast, here, Blanche Wardell testified in her
deposition that based upon her visits, telephone conversations and written
correspondence with the decedent, she believed that he was totally incapable
of making a will due to his markedly weakened mental abilities, which she
described at one point as senility and incompetence. This was further
corroborated by the medical records of the Oak Park Hospital regarding the
state of decedent's health, and by Wardell's testimony regarding the state of
squalor of decedent's house.
 Petitioner next contends that the trial court erred in granting
respondents' motion for summary judgment on the issue of undue influence. We
agree. In order to invalidate a will on the basis of undue influence, the
petitioner must establish that the intent of the testator was overpowered and
that he was induced to do or refrain from an act without free will, causing
him to devise his property according to the plan of another person. In re
Estate of Hoover, 155 Ill. 2d 402, 615 N.E.2d 736 (1993); Franciscan Sisters
Health Care Corp. v. Dean, 95 Ill. 2d 452, 448 N.E.2d 872 (1983);
Ciesiolkiewicz, 243 Ill. App. 3d 506, 611 N.E.2d 1278. The influence must
have been operative and must have been felt at the time the will was executed,
even though it could have been exerted at any time. Ciesiolkiewicz, 243 Ill.
App. 3d 506, 611 N.E.2d 1278. Furthermore, the more enfeebled the mind of the
testator, the less evidence is required to establish the existence of undue
influence. Mitchell v. Van Scoyk, 1 Ill. 2d 160, 115 N.E.2d 226 (1953);
Swenson v. Wintercorn, 92 Ill. App. 2d 88, 234 N.E.2d 91 (1968).
 To raise a presumption of undue influence, the party contesting the will
must establish the existence of the following four elements: (1) that a
fiduciary relationship existed between the testator and a person who
substantially benefits under the will; (2) that the primary beneficiaries were
in a position to dominate and control the dependant testator; (3) that the
testator reposed trust and confidence in such beneficiaries; and (4) that such
beneficiaries were instrumental in or participated in the procurement or
preparation of the will. Tidholm, 391 Ill. 19, 62 N.E.2d 473; Zachary v.
Mills, 277 Ill. App. 3d 601, 660 N.E.2d 1301 (1996); Ciesiolkiewicz, 243 Ill.
App. 3d 506, 611 N.E.2d 1278. A fiduciary relationship may exist as a matter
of law, such as in an attorney-client relationship, and may also arise from a
relationship which is moral, social, domestic or personal in its origin. 
Hoover, 155 Ill. 2d 402, 615 N.E.2d 736; In re Estate of Maher, 237 Ill. App.
3d 1013, 606 N.E.2d 46 (1992). Moreover, where a party having a claim to the
testator's bounty is excluded following the active participation of a
beneficiary in procuring a will, there is a presumption of undue influence
irrespective of the existence of a fiduciary relationship. Mitchell, 1 Ill.
2d 160, 115 N.E.2d 226; Maher, 237 Ill. App. 3d 1013, 606 N.E.2d 46. As
stated by our supreme court in Hoover,
 "What constitutes undue influence cannot be defined by fixed words
 and will depend upon the circumstances of each case. [Citation.] 
 The exercise of undue influence may be inferred in cases where the
 power of another has been so exercised upon the mind of the
 testator as to have induced him to make a devise or confer a
 benefit contrary to his deliberate judgment and reason. 
 [Citation.] Proof of undue influence may be wholly inferential
 and circumstantial. [Citation.] The inference may be that of a
 beneficiary or that of a third person which will be imputed to the
 beneficiary. [Citations.] False or misleading representations
 concerning the character of another may be so connected with the
 execution of the will that the allegation that such
 misrepresentations were made to the testator may present triable
 fact questions on the issue of undue influence. [Citations.]" 
 Hoover, 155 Ill. 2d 402, 411-12, 615 N.E.2d 736, 740.
 In the instant case, there are genuine issues of material fact which
should be resolved by the trier of fact as to whether respondents unduly
influenced William Roeseler in the execution of his May 1990 will. The record
supports a reasonable inference that respondents were in a fiduciary
relationship with the decedent and were therefore in a position to dominate
and control him, and that the decedent reposed trust and confidence in
respondents. Zachary, 277 Ill. App. 3d 601, 660 N.E.2d 1301; Ciesiolkiewicz,
243 Ill. App. 3d 506, 611 N.E.2d 1278. In that regard, the record reflects
that the decedent, due to his declining physical and mental health, relied
upon Barbara Kubitz for his basic needs such as going grocery shopping, to the
bank, and to pick up medical prescriptions. Additionally, the record supports
an inference that Bernice Chadwick and Maxine Christopher were neighbors of
and friends with the decedent and may have also assisted him as did Kubitz. 
See Hoover, 155 Ill. 2d 402, 615 N.E.2d 736 (a fiduciary relationship may
exist as a matter of law, such as in an attorney-client relationship, and may
also arise from a relationship which is moral, social, domestic or personal in
its origin). Moreover, in addition to these facts supporting an inference of
a fiduciary relationship between decedent and respondents, it is undisputed
that respondents Walter and Scott Christopher served the decedent as his
attorney, that Scott served as the decedent's tax preparer, and that Barbara
Kubitz had a power of attorney over the legal and financial affairs of the
decedent, relationships which are by their very nature fiduciary. See Hoover,
155 Ill. 2d 402, 615 N.E.2d 736; Maher, 237 Ill. App. 3d 1013, 606 N.E.2d 46.
 Respondents would urge that because Scott Christopher did not prepare
the May 1990 will, petitioner cannot now contend that respondents either
prepared or participated in the procurement of that will. They urge that the
fact that Scott would benefit from that will is irrelevant and the connection
between respondents and the will in question is too tenuous to support a claim
of undue influence. We disagree. As noted by our supreme court in Hoover,
 "Defendants argue *** that summary judgment was proper because
 plaintiffs failed to provide any evidence that Nancy's influence,
 *** was directly connected with the execution of the codicils
 which disinherited Robert, or that any influence on her part was
 directed towards procuring a will in her favor. We find that
 defendants' argument is misguided. In this case, plaintiffs'
 complaint alleges a subtle, invidious kind of undue influence. 
 *** [T]he testator may act as if directed and guided by his own
 agency but that agency may have been overpowered by 'secret
 influences.' [Citation.] In a 'secret influences' case,
 plaintiffs may introduce circumstantial evidence to demonstrate
 that the influence was connected with and operative at the time of
 execution of the will and that the influence was directed towards
 procuring the will in favor of the beneficiary. Hoover, 155 Ill.
 2d at 413-14, 615 N.E.2d at 741.
 As in Hoover, here, the fact that Scott Christopher did not personally
prepare the May 1990 will does not preclude the inference from the totality of
the evidence presented that respondents participated in the procurement and
preparation of that will and that they unduly influenced the decedent in the
creation of that will. In that regard, it is undisputed that despite his
acknowledgement that he felt "uncomfortable" preparing a will in which his
mother would be named as a beneficiary, Scott prepared the decedent's 1989
will, naming his own mother and her neighbors as the sole beneficiaries
therein and excluding the sole beneficiaries of decedent's prior wills, the
petitioner and her daughter, from any inheritance.
 It is further undisputed that in 1990, Scott Christopher, with the
consent of his client, engaged Kurt Heerwagen to revise the 1989 will, and
that under that revision, Scott stood to inherit directly from the decedent in
the event that his mother Maxine predeceased the decedent. Thereafter, Scott
sent Heerwagen a copy of the 1989 will, along with a letter outlining the
contents of the decedent's new will. Furthermore, Heerwagen only briefly
spoke with the decedent before preparing that will, and as noted, never knew
that the decedent had been married or had a step-daughter at that time. 
Ultimately, the 1990 will drafted by Heerwagen was identical to the 1989 will
drafted by Scott, except that the newer will explicitly named Scott's mother's
descendants as contingent beneficiaries in the event that she predeceased the
decedent. The record is also clear that Scott had an established professional
and social relationship with members of Herrwagen's firm. The foregoing facts
can support a reasonable inference of undue influence, especially insofar as
they raise an inference that Scott Christopher procured and in effect prepared
the decedent's May 1990 will. See Tidholm, 391 Ill. 19, 62 N.E.2d 473 (where
beneficiary under will gave notes to attorney preparing will, presumption of
undue influence arose to preclude directed verdict); Zachary, 277 Ill. App. 3d
601, 660 N.E.2d 1301 (question of fact as to undue influence issue existed
where son of attorney preparing will was named as a beneficiary). See also
Swenson, 92 Ill. App. 2d 88, 234 N.E.2d 91 (undue influence may be result of
activities of third persons as well as of activities of direct beneficiaries).
We also note, without giving this point undue emphasis, that the foregoing
inference of undue influence is further bolstered by the fact that Heerwagen
advised Scott Christopher to destroy the aforementioned letter outlining the
1990 will to preclude its use in a potential will contest, and from the fact
that Scott subsequently threw out that letter.
 Lastly, petitioner contends that the trial court erred in dismissing her
amended complaint which alleged respondents' tortious interference with her
economic expectancy to inherit from the decedent. We agree. To recover for
tortious interference with an economic expectancy, the petitioner must
establish the following: (1) the existence of their expectancy; (2)
respondents' intentional interference therewith; (3) tortious conduct such as
undue influence, fraud, or duress; (4) a reasonable certainty that the
expectancy would have been realized but for the interference; and (5) damages. 
In re Estate of Knowlson, 204 Ill. App. 3d 454, 562 N.E.2d 277 (1990); Nemeth
v. Banhalmi, 99 Ill. App. 3d 493, 425 N.E.2d 1187 (1981). If a will contest
is available and would provide an adequate remedy to the petitioner, no tort
action will lie. In re Estate of Hoover, 160 Ill. App. 3d 964, 513 N.E.2d 991
(1987). However, if no adequate remedy is available through probate
proceedings, a tort action is permissible. Knowlson, 204 Ill. App. 3d 454,
562 N.E.2d 277; In re Estate of Jeziorski, 162 Ill. App. 3d 1057, 516 N.E.2d
422 (1987). In determining the adequacy of relief, an award for punitive
damages is not considered a valid expectation. Knowlson, 204 Ill. App. 3d
454, 562 N.E.2d 277; Hoover, 160 Ill. App. 3d 964, 513 N.E.2d 991.
 Here, the availability of probate relief is only speculative pending the
consideration of the decedent's prior wills by the probate court, and
therefore, the dismissal of that action was in error. In that regard, if on
remand the petitioner succeeds in her will contest and the decedent's 1984
will naming her as the primary beneficiary is then admitted to probate, the
dismissal of the tort claim would be appropriate because the adequacy of the
probate relief would be undisputed. See Knowlson, 204 Ill. App. 3d 454, 562
N.E.2d 277; Hoover, 160 Ill. App. 3d 964, 513 N.E.2d 991 (1987). However, if
the 1984 will is not admitted, the petitioner's relief in probate would be
inadequate, such that she should be able to proceed against respondents with
her tort action. Knowlson, 204 Ill. App. 3d 454, 562 N.E.2d 277. Pending
these determinations, the dismissal of the tort complaint here was premature,
especially to the extent that it contains the same underlying allegations of
tortious conduct as those described in the will contest petition, which has
now been revived.
 Respondents would urge that the decisions of Robinson v. First State
Bank of Monticello, 97 Ill. 2d 174, 454 N.E.2d 288 (1983) and Hoover, 160 Ill.
App. 3d 964, 513 N.E.2d 991 (1987), support the dismissal of petitioner's tort
claim. However, those cases are fully distinguishable. In Robinson, the
court denied the petitioner's tort action because it was not filed within the
six-month statute of limitations period governing the filing of will contests
after the admission of the will to probate. There is no such infirmity
alleged here. See Jeziorski, 162 Ill. App. 3d 1057, 516 N.E.2d 422
(distinguishing Robinson on same grounds). Furthermore, in Hoover, the
availability of relief to the petitioner from earlier will and codicils was
not speculative because those documents were already admitted to probate. As
noted, unlike Hoover, here, adequate relief is not certain absent a tort
action pending the admission of the decedent's prior wills to probate.
 For the foregoing reasons, we conclude that there are material issues of
fact which would preclude the entry of summary judgment on petitioner's will
contest and the dismissal of her tort complaint for intentional interference
with economic expectancy. Accordingly, the judgment of the Circuit Court of
Cook County is reversed and the cause remanded for further proceedings.
 COUSINS, Jr., P.J. and HOURIHANE, J., concur.